THE APALACHICOLA LAND AND DEVELOPMENT COMPANY, A DECLARATION OF TRUST, H. L. FLOWERS, H. D. MARKS, S. E. RICE, JR., R. R. RICE, C. E. SMITH, JOSEPH MESSINA, J. J. ABBOTT, H. B. ROBBINS AND W. H. COLLIER, TRUSTEES; AND N. R. HAYS, S. E. TEAGUE AND H. L. OLIVER, *Appellants,* v. W. A. McRAE, COMMISSIONER OF AGRICULTURE OF THE STATE OF FLORIDA, AND T. R. HODGES, SHELL FISH COMMISSIONER OF THE STATE OF FLORIDA, *Appellees.*

Opinion Filed November 8, 1923.

Petition for rehearing denied December 20, 1923.

1. A suit to obviate the effect of an illegal act of a State officer as such is not a suit against the State, for the State authorizes only legal acts by its officers.

2. A demurrer in equity does not admit legal conclusions asserted in the bill of complaint, or conclusions of fact not justified by the facts alleged, or assertions of ultimate facts that are not sustained by the facts alleged, particularly when the right asserted as a conclusion depends upon unusual provisions of law and proceedings thereunder and no such provisions or proceedings are made to appear.

3. Even if in this State lands below high water mark may be the subject of private ownership, such a right would be a most unusual and extraordinary one that should be particularly shown when claimed in a suit.

4. It is settled law in this State that private ownershipi of lands bordering on navigable waters extends only to high water mark.

5. If under valid Spanish grants or otherwise private ownership is claimed in lands below the high water mark, the source and authority for such claimed ownership should be made to appear by proper allegations and exhibits or by reference to matters of which judicial notice is taken.

6. Since under the Spanish law as well as under the law of this. State private ownership of uplands stops at high water mark on navigable waters except perhaps, under special and particular provisions and action of sovereign governmental authority, those claiming ownership below high water mark must show the source and muniments of title from competent authority to make such a grant against the rights of the public in the shores of navigable waters in this State.

7. Allegations as to muniments of title and their legal effect, that are mere conclusions not supported by allegations of fact or by matters duly exhibited or of which the court may take judicial notice, are defective.

8. Where private ownership is asserted in property that under the law is a subject of common or public use, the claimant must clearly show that the private exclusive right that is asserted was lawfully acquired through competent authority in the premises.

9. When Spain acquired territory by discovery or conquest, in North America, the possessions were vested in the Crown; and grants or concessions of portions thereof were made according to the will of the Monarch.

10. While the civil law was the recognized jurisprudence of Spain and its rules were generally observed, yet the Crown could exercise its own discretion with reference to its possessions.

11. While the Floridas were subject to the dominion of Spain the Indians could make no grant or concession of lands in the Floridas except in accordance with the dominant authority of Spain.

12. Ordinances and edicts that had the force of laws, were promulgated to be observed in the Spanish Provinces in America; and these included authority to designate officials to make or confirm cessions of land.

13. The right of the Indians to occupy for their accustomed habitation and tribal purposes the lands they occupied when the provinces of Spain were established in America, was recognized by the Spanish Monarch; and while the ultimate title and right of disposition of lands and waters in the provinces were vested in the Crown, the Indians were permitted to cede their recognized right of perpetual occupancy in the lands, to private ownership, provided such cession was agreeable to and confirmed by the Spanish Monarch or by his authority, the policy of Spain being to make or confirm grants, and, as to Indian grants of lands, to perfect title in accepted grantees for purposes of settlement and cultivation by others than Indians.

14. Under the civil law in force in Spain and in its provinces when not superseded or modified by ordinances affecting the provinces or by edict of the Crown, the public navigable waters and submerged and tide lands in the provinces were held in dominion by the Crown as *res communes* and used as *res omnium;* and sales and grants of such lands to individuals were contrary to the general laws and customs of the Realm.

15. By the laws and usages of Spain the rights of a subject or of other private ownership in lands bounded on navigable waters derivêd from the Crown, extended only to high water mark, unless otherwise specified by an express grant.

16. Though the Spanish possessions in America were held by the Crown to be disposed of at will, a grant or concession of lands under navigable waters and tide lands was not in accord with usual customs of the Kingdom, such lands and waters being held as *res communes* for the public use; and a conveyance of them to private ownership could be consummated only by a clear showing of express sovereign intent.

17. The difference in the nature and uses of uplands and of lands under navigable waters, including the shore and tide lands, and the manner and purposes of their dominion by the sovereign, permitted sales and grants of uplands to private ownership for purposes of cultivation and improvement as a matter of State policy to encourage development; but as the navigable waters and lands thereunder were necessary for public purposes and their ownership by private parties would be detrimental to the public good, no such private ownership was contemplated or permitted unless it was expressly authorized by the Crown to promote a public purpose, and then the public use was excluded only in so far as the private grant was in fact utilized as expressly authorized to serve a useful public need or advantage.

18. The title of the Indians to the lands in the provinces of East and West Florida under the Spanish Monarchy was in the nature of a possessory right, held in common according to prevailing customs and tribal dominance among the Indians, subect to the sovereign dominion of the Crown.

19. Under the laws of Spain applicable to its Florida provinces, the navigable waters of the seas and bays were held by the Crown for public common uses of navigation, fishing, bathing, &c.; and in consonance with the prevailing customs and uses, the lands under navigable waters were not ordinarily a subject of private ownership or of grant or sale, and when a con--

veyance or concession was made to private parties by the Indians subject to confirmation by the duly constituted Spanish authorities, such conveyance or concession had reference to lands embraced in the possessory right or title of the Indians who made the conveyance or grant, and a confirmation thereof was of course confined to the intent and scope of the grant as made by the Indians who were in possession of lands; and the grant did not cover any of the navigable waters of the sea or bays and the submerged lands thereunder, the ownership of which latter was in the Crown of Spain by virtue of its sovereignty over the provinces, including all the rights in and to the waters of the sea and lands thereunder that were incident to Spanish sovereignty of the provinces as recognized by the laws of Nations.

20. The confirmatory patent issued by the United States covers "the lands and islands at and west of the mouth of the Apalachicola River, which were ceded, granted and confirmed to John Forbes & Co., in 1811," and does not include submerged lands or tide lands.

This case was decided by Division B.

An Appeal from the Circuit Court for Franklin County; E. C. Love, Judge.

Affirmed.

*E. Tillman Davis* and *Fred H. Davis,* for Appellants;

*Rivers Buford,* Attorney General, *J. B. Gaines,* Assistant Attorney General, and *Fred T. Myers,* for Appellees.

STATEMENT.

This suit was brought by parties claiming lands through an Indian-Spanish Grant to John Forbes & Co. made in 1811, the purpose of the suit being to enjoin designated

State officials from leasing or using for planting and cultivating oysters, certain submerged lands under navigable and tide waters of a bay of the Gulf of Mexico south of the mainland in Franklin County, Florida, the plaintiffs' claim being that such submerged lands passed to them through an Indian-Spanish Grant to John Forbes & Co. in 1811, and confirmed by the United States to Colin Mitchel, *et al.*, the lands of which grant originally made to John Forbes & Co. constitute a portion of what is commonly known in Florida as 'Forbes Purchase,'' comprising several Indian-Spanish land grants which were confirmed by the United States to Colin Mitchell *et al.*, Mitchell v. United States, 9 Pet. (U. S.) 711.

## FORBES PURCHASE.

The lands and islands that constitute the area known as ''Forbes Purchase,' 'are, except the islands, situated in a more or less compact body, extending into the counties of Franklin, Calhoun, Liberty, Gadsden, Leon and Wakulla, in Florida.

Prior to the cession in 1819, of the Floridas to the United States by Spain, trading companies known as Panton, Leslie & Co., and their successors John Forbes & Co., by permission of the Crown, did an extensive mercantile business among the Indians in East and West Florida, the dividing line between the Floridas being the Apalachicola River. Large indebtednesses to said mercantile company having been incurred by the Indians which they could not pay, and depredations upon the merchandise stores of said companies having been made by the Indians, the Indians in consideration of such indebtedness and depredations, ceded to the companies at different times large tracts of lands ''occupied by said Indians.'' The cessions of these lands,

including islands, were confirmed by the Spanish authorities and were referred to as "lands and islands" "contained within stated limits."

Speaking generally the "lands and islands" composing the several Indian-Spanish grants or cessions included in "Forbes Purchase" are as shown on the accompanying map or "Diagram" as follows:

1.  Grant to Panton Leslie & Co. confirmed by Spanish authority in 1804 and 1806.

2.  Grant to John Forbes & Co. confirmed by Spanish authority in 1811.

3.  Grant of an Island in Apalachicola River to John Forbes confirmed by Spanish authority in 1811.    This Island is in Calhoun County, Florida.

The grant by the Indians to Panton Leslie & Co. concluded and confirmed by Spanish authorities in 1806, extends from the Apalachicola River East to Wakulla River, including islands between the mainland and the Gulf of Mexico from the mouth of the St. Marks River to the western end of St. Georges Island, the same being "A district of land of which they (the Indians) are at present owners and proprietors, and contained within the following limits: leaving the Apalachicola River five miles above Estefulgee, the line runs through the hammock of said river and the adjacent pine barren, in a direction E. and E. S. E. more than three miles, till it meets with the principal path from Estefamulgee to the nation; then follows said path N. and N. N. E. eleven miles and a half or twelve miles, to the spot where the path from Micasukey to Estefamulgee separates from the other; thence the line runs along the same path from Micasukey, E. three miles and a half to a ravine; thence along the same path E. and N. E. by E. two miles and a half to another ravine; thence, still along the same path N. E. and E. above a mile, till the junction with

the path of Ochesee, alias that of John Mealby, to Apa-
lachy; thence, running the same in a direction S. E. about
three-quarters of a mile, to the river Tologie; thence, still
along same, E. four miles and three-quarters, till the spot
where the path of John Mealby to Apalachy separates;
thence, the line follows the path of Micasuky (which might
more properly be called the path of Ochesee to Anachee-
ler) E. by N. one mile and a quarter, to the extremity of a
hammock; thence, along the same path, N. E. and E. N. E.
one mile and a half to four pine trees marked with crosses;
here, leaving the path the line runs through the hammock,
and crosses two ravines N. E. by E. one mile and thirty-six
chains, till it meets with a path from Anacheeler to the
south.; crossing said path for fifty-eight chains, it follows
till it meets with another path leading from Anacheela to
Micasuky, at a distance of one measured mile from Ana-
cheela; thence, following said path whose directions vary
between S. E. and N. E. three miles, till a spot where a
path separates leading to the south; leaving this path, and
still following the former along which we came, the line
runs through it in a direction E. and E. N. E. a mile and a
half to a ravine; thence running in the same path N. E.
by N. one mile, till its junction with Thompson's path,
which comes from the N. W.; thence, following the same
path, here called Thompson's path, S. E. by S. one mile and
a quarter till little river; thence, following the same path
N. E. by E. E. N. E. and E. one mile, till the spot where
the path of Micasuky separates; thence, it follows always
the same path of Thompson's S. E. by E. one-third of a
mile to a ravine; thence, always in the same path, in vari-
ous directions between S. E. and N. E. two miles and a half
to another ravine; crossing which, it goes in a direction S.
still along the same path one mile and a half to the river
Ocklockney; thence, along the same path in various direc-

tions between S. and E. eighteen miles, to the extremity of the hammock on the river Wakulla, where two pine trees are marked with crosses at one mile distance from the house of John Keimaire; thence, crossing the hammock and a ravine, it runs S. by E. sixty-one chains; thence S. S. E. to a pine. marked with a cross, sixteen chains; thence E. S. E. sixty-four chains, and thence E. N. E. ninety-six chains, to a road which leads from the house of Keimaire to Fort St. Marks; thence it runs crossing the road forty-six chains N. N. E. to the river Wakulla, the channel of which forms the boundary as far as the sea to the east in the same manner as the great channel of the river Apalachicola from its mouth to five miles above Estefamulgee, forms, with a part of the above line the limits to the west, and the high seas beyond all the islands on the coast, form the limits to the south.''

The grant to John Forbes & Co. confirmed by Spanish authority in 1811, consists ''of two pieces of land contiguous and adjacent to that which, in 1806, * was ceded * to the house of Panton Leslie & Co.,'' the first of the ''two pieces of land'' being within limits described as beginning ''at the mouth of the river Apalachicola, and following *the line on the west margin,* it ascends the Lake Weinico, three miles from its entrance, which spot is known by two cypresses marked with crosses; and thence, through the hammock the distance of one chain south to a cypress marked; here it was found impracticable to trace the line further on account of the bad way, but it should run 72 degrees west, a supposed distance of 1,280 chains, where a pine is marked; thence south 30 degrees, west 100 chains, to a pine marked with a cross, on the margin a reedy marsh; thence the line runs by water, one mile and a quarter, south 14 degrees west, to the extreme western point of St. Vincent's or Deer Island,, including the whole of the island.'' These desig-

nated limits include ''the lands and islands at and west of the mouth of said (Apalachicola) river.'' The other of the ''two pieces of land'' granted to John Forbes & Co. in 1811, may be described as leaving the east end of St. Vincent's Island, crossing the bay towards the northeast, ''thence ascending the river Apalachicola, and *beginning the line* at the boundary of the lands formerly ceded to the house of Panton, Leslie & Co. (at a point on the Apalachicola River ''five miles above Estefamulgee'' on said river) and running the same up the said river to the mouth of the creek Cosaph Chuchee, or Sweet Water; thence following up said creek to its source, where a hickory is marked with a cross; thence, crossing the path by land north 79 degrees east, the line runs the distance of 27 chains 85 links to a pine marked with a cross; thence north 58 degrees east 11 chains 47 links, to a pine crossed; thence north 65 degrees, east 18 chains 58 links, to another pine marked; thence north 42 degrees east, 26 chains and 36 links to another pine, marked; thence north 75 degrees, east 16 chains and 9 links, to another pine marked; thence north 40 degrees east, 22 chains 50 links, to another pine marked with a cross; thence north 60 chains 36 links to another pine marked; thence north 25 degrees, east 5 chains, to another pine marked; thence north 35 degrees, east 24 chains, to another pine marked; thence north 82 degrees, east 241 chains, to another pine marked with a cross; here is the boundary line of the lands ceded to the house of Panton, Leslie & Co., the line following which runs till it crosses the river Ocklocknee, and again runs the distance of 5½ miles to a pine marked; thence south 80 degrees east, 32 chains, to another with a cross; thence south 78 degrees east, 1,251 chains 51 links, to an oak marked with a cross, on the west margin of the river St. Marks, a little distance above the spot where the same runs underground; thence

the line runs through the thicket in the neighborhood to where the said river appears again; and thence to its junction with the sea.'' See 2 White's New Recompilation, p. 359.

The lines last above stated cover an irregular tract of land marked on the Diagram ''Claim in the name of John Forbes & Co.'' to the northwest of the Panton, Leslie & Co. grant, *and such lines also include another triangular tract of land* marked on Diagram ''claim in the name of John Forbes & Co.'' to the east of the Panton, Leslie & Co. grant and lying between the Wakulla and St. Marks Rivers, at the southern point of which tract at the junction of the Wakulla and St. Marks Rivers is the ''St. Marks Reservation United States'' referred to in the Patent issued pursuant to the decision of the United States Supreme Court in Mitchel v. United States, 9 Pet. (U. S.) 711. The grant to John Forbes & Co. in 1811, covers ''in reality three distinct tracts, considerably distant from each other.'' See pages 220 *et seq.* of record in case of Mitchel v. United States, in Florida Supreme Court Library; Mitchel v. United States, 15 Pet. (U. S.) 52, text 85; 2 White's New Recompilation, 359.

The Patent issued by the United States confirming the Indian-Spanish Grants to Colin Mitchel, *et al.,* is as follows:

''THE UNITED STATES OF AMERICA.

''To All to whom these presents shall come, Greeting.

''*Whereas,* it appears that under the authority of the Sixth Section of the Act of Congress, approved on the twenty-third day of May, One thousand eight hundred and twenty-eight, entitled, 'AN ACT supplementary to the several Acts providing for the settlement and confirmation of private Land Claims in Florida,' and an Act of Con-

gress approved on the twenty-sixth day of May one thou-
sand eight hundred and twenty-four (and referred to in
the said Act of the twenty-third day of May one thousand
eight hundred and twenty-eight) entitled 'An Act enabling
the Claimants of lands within the limits of the State of
Missouri and Territory of Arkansas to institute proceed-
ings to try the validity of their claim. 'Colin Mitchel, Rob-
ert Mitchel, in his own right and as assignee of the Estate
and effects of the Mercantile House, heretofore trading
under the firm of Carnochan and Mitchel, and as trustees
of the creditors of said firm, and also of Richard Carno-
chan, William Calder, Benjamin Marshall, Benjamin W.
Rogers, John P. Williamson, the heirs, and legal repre-
sentatives of John McNish, deceased, and James Inner-
arity, presented their petition on the eighteenth day of
October one thousand eight hundred and tewnty-eight, to
the Superior Court of Middle Florida, praying that the
validity of their claim to certain lands may be enquired
into and confirmed, according to the true and equitable in-
tent and meaning of the treaty of twenty-second of Feb-
ruary, one thouand eight hundred and nineteen between
his Catholic Majesty and the United States, and the laws
and Ordinances under which the claim of the Petitioners
was derived, and the Act of Congress authorizing a decis-
ion of the same, and the Superior Court of Middle Florida
having decreed the claim to the land and premises in the
petition mentioned and sued for, to be invalid and illegal,
the cause was brought up by appeal to the Supreme Court
of the United States, which court at their January term,
one thousand eight hundred and thirty-five, declared their
opinion 'that the title of the Petitioners to so much of the
lands in controversy as is embraced within the lines and
boundaries of the tract granted by the deeds, grants and
Acts of Confirmation to Panton, Leslie & Co. in 1804 and

1806; Also the Island in the river Apalachicola, ceded, granted and confirmed to John Forbes in 1811; also to the lands and Island at and west of the mouth of said river, which was ceded, granted and confirmed to John Forbes & Co. in 1811, is valid by the laws of Nations; the treaty between the United States and Spain, by which the Territory of the Floridas was ceded to the former; the laws and Ordinances of Spain, under whose Government the title originated; the proceedings under said treaty, and the Acts of Congress relating thereto; and 'did' finally order, decree, determine and adjudge accordingly;—'and the said .Supreme Court did in like manner' order, adjudge, determine and decree, that the title of the petitioners to so much of the tract of land which lies east of the first mentioned tract, between the rivers Wakulla and St. Marks, which was conveyed to John Forbes & Co. in 1811, as shall not be included in the exception hereinafter made, is valid by the laws, treaty and proceedings as aforesaid; with the exception of so much of the last mentioned tract as includes the Fortress of St. Marks, and the territory directly and immediately adjacent and appurtenant thereto,' which by the said decree are 'reserved for the use of the United States,' and the court 'further ordered and decreed, as follows, to-wit: that the territory thus described shall be that which was ceded by the Indians proprietors to the Crown of Spain for the purpose of erecting the said Fort, provided the boundaries of the said cession can be described.

"If the boundaries of the said cession cannot be ascertained then the adjacent lands which were considered and held by the Spanish Government, or the Commandant of the Post as annexed to the Fortress for Military purposes, shall be still considered as annexed to it, and reserved with it for the use of the United States. If no evidence can now

be obtained to designate the extent of the adjacent lands, which were considered as annexed to St. Marks as aforesaid, then so much land shall be comprehended in this exception as, according to military usage, was generally attached to Forts in Florida, or the adjacent Colonies.

"If no such military usage can be proved, then it is ordered, and decreed that a line shall be extended from the point of the junction between the river St. Marks and Wakulla to the middle of the river St. Marks below the junction, thence extending up the middle of each river three miles in a direct line, without computing the courses thereof; and that the territory comprehended within a direct line to be run, so as to connect the points of termination on each river, at the end of the said three miles up each river and the two lines to be run as aforesaid, shall be, and the same is hereby declared to be, the territory reserved as adjacent and appurtenant to the Fortress of St. Marks, and as reserved for the use of the United States. To which the claim of petitioners is rejected; and as to which this Court decree that same is a part of the public lands of the United States.

"The decree of the Court below is, therefore, reversed and annulled in all matters and things therein contained, with the exception, aforesaid; and this Court, proceeding to render such decree, as the said Court ought to have rendered, do order, adjudge and decree, that the claim of petitioners is valid and ought to be confirmed, and is and remains confirmed by the treaty, laws and proceedings aforesaid, to all the lands embraced therein, except such part as is herein above excepted, and this Court does further order, adjudge and decree that the Clerk of this Court certify the same to the Surveyor General of Florida, pursuant to law, with the directions to survey and lay off the lands described in the petition of the claimants, according

to the lines, boundaries and description thereof in the several deeds of Cession, grant and confirmation by the Indians or Governor of West Florida filed as exhibits in this cause, or referred to in the record thereof, excepting nevertheless such part of the tract granted in 1811, lying east of the tract granted in 1804 and 1806 as is hereby declared to be the territory of the United States, pursuant to the exception, hereinbefore mentioned, and to make return thereof according to law as to all the lands, comprehended in three first mentioned tracts.  And as to the tract last herein mentioned to survey and in like manner to lay off the same so soon as the extent of the land herein excepted and reserved for the use of the United States shall be ascertained in the manner herein before directed.  And this Court doth further order, adjudge and direct that the extent and boundaries of the land thus excepted and reserved shall be ascertained and determined by the Superior Court of the Middle District of Florida in such manner and by such process as is presented by the Acts of Congress relating to the claims of lands in Florida, and to render thereupon such judgment or decree as to law shall appertain.'

"And, whereas, it appears that on the thirtieth day of January, one thousand eight hundred and thirty-six, Colin Mitchel and others, the appellants in the Supreme Court, filed in the Superior Court of Middle Florida, the decree and mandate of the Supreme Court, in this case, and subsequently filed a bill in the said Superior Court wherein they claimed the lands to the walls of the Fort of St. Marks, on all sides; and prayed confirmation thereof to the said walls of the fort as aforesaid to be held, as it was, under the Dominion of Spain, according to the treaty of Cession, and the proceedings under it in other cases, and on the fourteenth of February, one thousand eight hundred and thirty-eight

filed an amended petition in the same Court, in which they assert the fee in the land on which the Fort of St. Marks is erected, to have been and then to be in themselves whilst they admit the right of the Government, of the United States for the purpose of a Fort; and therefore prayed that the fee of the lands covered by the Fort, as well as that adjoining and appurtenant, should be decreed to them whilst the use thereof, for the purpose of a Fort, might be reserved, by a decree of that Court, to the Government of the United States and the said Superior Court for the Middle District of Florida, having on the thirtieth of June, one thousand eight hundred and thirty-eight, decreed that 'the boundaries of the territory, ceded by the Indians to Spain, for the purpose of erecting the Fortress of St. Marks, cannot be ascertained; that no evidence can now be obtained to designate the extent of the adjacent lands, which were considered as annexed to said Fortress by the Crown of Spain, or the Commandant of said Post. But that there is evidence of military usage of Spain to determine the extent of land adjacent to forts in Florida, which were usually attached to said forts; that the extent of such reservations was determined by the radius of fifteen hundred Castilian varas from the salient angles of the covered way, all round the works, or there being no covered way from the salient angles of the exterior line of the ditch—' and the said Court 'therefore decreed, that the lands adjacent to the fortress of St. Marks to be reserved to the use of the United States, and as a part of the public lands of the same, shall be ascertained, described and determined as follows, viz: from the eastern point of that part of the exterior line of the ditch which is in advance of and parallel with the northern face of the bastion, and opposite the shoulder of the same, a line will be drawn at right angles with that face of the bastion fifteen hundred Castilian varas, from

the same point of beginning; two other lines of fifteen hundred varas, in length, will be drawn and extended to points on the margin of the two rivers, St. Marks and Wakulla respectively; from the central one of these three radii; and thence extending in the same lines, to the center of the two rivers, St. Marks and Wakulla; and all the land comprehended within these lines and the middle of each river, from termination tô the confluence of the two rivers below the Fort St. Marks, shall be· the land reserved to the use of the United States. The 'vara' to be used in this survey to be the Castilian or judicial 'vara' of Spain five thousand of which make a league, and are equal in length to four thousand six hundred and thirty-five English yards; and they 'further ordered, that the Clerk should certify the decree to the Surveyor General of Florida, pursuant to law, with directions to survey and lay off the lands thus reserved to the United States according to the lines, boundaries and description thereof, in the decrees; and from this decree, an appeal to the Supreme Court having been prosecuted by Colin Mitchel and others, that Court at its January term, one thousand eight hundred and forty-one, gave their opinion, 'that the court below 'had' fully apprehended and executed the judgment of this Court and its judgment is accordingly affirmed and the Supreme Court of the United States 'ordered and decreed' that the decree of the said Superior Court, in this cause be, and the same is hereby affirmed.'

"NOW KNOW YE, that pursuant to the decree of confirmation, and the Acts of Congress aforesaid, under which they were given, the Surveyor General of Florida has made to the General Land Offices of the United States returns of the official survey of the lands confirmed by decree as aforesaid, and situated in the Territory of Florida, and has also transmitted to the Commissioner of

the General Land Office a Diagram or Plat of the survey
of the lands confirmed as aforesaid, authenticated on the
fifteenth day of January, one thousand eight hundred and
forty-two, by the signature of the said Surveyor General
of the Public Lands for the Territory of Florida, which
Diagram of Plat is in words and figures following, to-wit:
(See diagram attached).

DIAGRAM.

Of the survey of the Forbes Purchase under the decree of the Supreme Court
of the United States, i connexions of the Public Land therewith

Summary of the several Grants embracing Forbes Purchase.

| | |
|---|---|
| Panton Leslie & Co (in the name of) .. Acres | 1,276,868 ⁷⁷/₁₀₀ |
| Jno Forbes & Co | 140,609 ²⁰/₁₀₀ |
| Jno Forbes Island | 9,811 |

Aggregate  1,427,289 ⁹⁷/₁₀₀ Acres

Surveyor Generals Office, Tallahassee, January 15th 1842

Robert Butler
Sur. General

"To the area as stated in the above, of the John Forbes Island is to be added ninety-six hundredths of an acre (96/100) the area of that island being according to the particular plat of the same nine thousand eight hundred and eleven acres and ninety-six hundredths of an acre (9811.96/100) making the aggregate area of the lands embraced within the limits of the claims as confirmed, one million four hundred and twenty-seven thousand, two hundred and ninety acres and seventeen hundredths of an acre including the quantity that may be found in the sales hereinafter excepted but exclusive of the quantity of land contained in the 'Territory reserved as adjacent and appurtenant to the Fortress of St. Marks, and as such reserved for the United States by the before mentioned decrees of the Superior Court, and thereby declared 'a part of the public lands of the United States' which reservation is indicated on the foregoing Diagram particularly exhibited by the following:

"The several tracts of land referred to in the foregoing as confirmed by decree of the Supreme Court of the United States, and embracing in the aforesaid returns of survey and in the foregoing diagram or plat (on page 6) authenticated as aforesaid by the said Surveyor General, viz: The tract granted by the deeds, grants and Acts of

confirmation to Panton, Leslie & Co., in 1804 and in 1806;
also the island in the river Apalachicola, ceded, granted
and confirmed to John Forbes in 1811; also the lands and
islands at and west of the mouth of said river, which were
ceded, granted and confirmed to John Forbes & Co. in
1811; also the portion confirmed by decree of the residue
of the land conveyed to John Forbes & Co. in 1811, being
all embraced by the following boundaries, to-wit: Bounded
on the south and southeast by the reservation at St.
Marks, the river St. Marks, the Appalachee Bay, and the
Gulf of Mexico; on the west by public lands, namely, by
fractional township nine south, of range ten west, by
fractional township eight south, of range nine west, by
Lake Wee Nee Coe, and by the Apalachicola river, on the
north by the middle Sweet Water Creek, by fractional
township one north, of range seven west, by fractional
township one north, of range six west, by fractional town-
ship one north, range five west; by fractional township
two north, of range five west; by fractional township two
north, range four west, by fractional township one north,
range three west, by fractional township two north, range
three west; and on the northeast and east by public lands,
viz: by fractional township one north, of range two west,
by fractional township one south, of range two west, by
fractional township one south, range one west, by frac-
tional township two south, of range one east, by fractional
township two south, of range two east and by St. Marks
river, including the following islands, namely, Leward
Island, Middle Island, South or Windward Island, Piney
Island, Dog Island, St. Georges Island, St. Vincents, or
Deer Island, and Forbes Island, hereinbefore mentioned;
excepting and reserving also from the survey hereinbefore
mentioned, of the lands confirmed as aforesaid and known
as the 'Forbes Purchase,' the following tracts or parcels

of land which were sold as public property prior to the eighteenth day of October, one thousand eight hundred and twenty-eight, when the petition for confirmation was originally filed in this cause, the sale referred to being excepted and reserved pursuant to the eleventh section of the Act of the twenty-sixth day of May, one thousand eight hundred and twenty-four, hereinbefore mentioned as extended to certain Florida claims by virtue of the aforesaid Act of the twenty-third day of May, one thousand eight hundred and twenty-eight, entitled 'An Act supplementary to the several Acts providing for the settlement and confirmation of private land claims in Florida,' &c., viz:

"The east half of the northwest quarter of Section thirty, in township two south, of range one east, the west half of the northwest quarter of Section thirty in township two south, of range one east, the east half of the southwest quarter of Section thirty, in township two south, of range one east, the west half of the southwest quarter of Section thirty, in township two south, of range one east; (situated within the limits of the 'Forbes Purchase').

"Lot number two, or such portion thereof as falls within the said 'Forbes Purchase' of section two in township four south, of range one east.

"Such portion as falls within the said 'Forbes Purchase' of the west half of the southeast quarter of section twenty-nine, in township two south, of range two west.

"The southwest quarter of section twenty-nine in township two south, of range two east, situated within the limits of the said 'Forbes Purchase.'

"Such portions or parcels of the following described tracts as are situated within the limits of the said' Forbes Purchase,' viz: of the west half of the northeast quarter of section five, in township three south, of range two east.

"Of the east half of the southeast quarter of section five, in township three south, of range two east.

"Of the west half of the southeast quarter of section five, in township three south of range two east.

"Of the northwest quarter of section eight, in township three south, of range two east.

"Of the southeast quarter of section eight, in township three south, of range two east.

"Of the east half of the southwest quarter of section eight, in township three south, of range two east, also

"Lot number one, of section eighteen, in township three south, of range two east.

"Lot number two, of section eighteen, in township three south, of range two east.

"Lot number three, of section eighteen, in township three south, of range two east.

"Lot number five, of section eighteen, in township three south, of range two east.

"Lot number six, of section eighteen, in township three south, of range two east; situated within the limits of the 'Forbes Purchase.'

"Such portions or parcels also of the following described tracts as are situated within the said 'Forbes Purchase,' viz:

"Of lot number seven, of section eighteen, in township three south, of range two east, of the northwest quarter of section seventeen, in township three south, of range two east, of the west half of the southwest quarter of section seventeen, in township three south, of range two east.

"Of lot number eight, of section eighteen, in township three south, of range two east.

"There is therefore granted by the United States unto the said Colin Mitchel, Robert Mitchel in his own right, and as assignee of the estate and effects of the Mercantile

House heretofore trading under the firm name of Carno-
chan & Mitchel, and as trustee of the creditors of said firm,
and also of Richard Carnochan, William Calder, Benjamin
Marshall, Benjamin W. Rogers, John P. Williamson, the
heirs and legal representatives of John McNish, deceased,
and James Innerarity, the lands hereinbefore mentioned
and referred to as being confirmed to the claimants accord-
ing to the true intent and meaning of the aforesaid
decrees of confirmation, and agreeable to the actual and
official survey of the said lands as examined and approved
by the Surveyor General of Florida, pursuant to those
decrees, and certified to the General Land Office, with the
exception and reservation from the transfer by these
presents of the said reservation at St. Marks, and so much
of the land sold (as hereinbefore described) as public
property before the original filing of the petition for con-
firmation.

"To have and to hold the lands confirmed as aforesaid
with the appurtenances unto the said Colin Mitchel,
Robert Mitchel, in his own right and as assignee of the
estate and effects of the Mercantile House heretofore trad-
ing under the firm name of Carnochan & Mitchel, and as
trustee of the creditors of said firm, and also of Richard
Carnochan, William Calder, Benjamin Marshall, Benjamin
W. Rogers, John P. Williamson, the heirs and legal repre-
sentatives of John McNish, deceased, and James Inne-
rarity, and to their heirs and assigns forever, subject to all
reservations and exceptions as aforesaid.

"In Testimony Whereof, I, John Tyler, President of the
United States, have caused these letters to be made patent,
and the seal of the General Land Office to be hereunto
affixed.

"Given under my hand at the City of Washington, the
ninth day of June in the year of our Lord, one thousand

eight hundred and forty-two, and of the Independence of the United States the sixty-sixth.

JOHN TYLER.

By the President:

J. WILLIAMSON.

Recorder of the General Land Office.''

The field notes or other details of the survey shown by the diagram are not in the record.

The certified transcript, now in the Florida Supreme Court Library, of the record filed in the United States Supreme Court in the case of Mitchel *et al.* v. United States, 9 Pet. (U. S.) 711, shows, pages 223 *et seq.* that as to the portion of the grant to John Forbes & Co., in 1811, ''comprehended between the river St. Marks and the eastern limits of the cession made to the house of Panton, Leslie & Co., its area is computed at 82,500 English acres, equal to 97,485 arpents of Paris, and 45-128ths of another. The other portion, contained between the western limits of the upper part of the cession in favor of the aforesaid house of Panton, the river Apalachicola, and the Fresh Water Creek, according to the calculation of the same Forbes, its area is 18,500 acres, equal to 21,860 arpents, and 45-128ths of another. The other portion, between the river Apalachicola, the Lake Wimino, the line running to the point in front of the most western point of the island of St. Vincent's (including this last) the said Forbes did not compute the area, nor is it easy to ascertain it; for this tract is figured differently in the plan signed by Forbes, and in the one which is attached to the process upon the subject, as I have been informed; but, taking a middle term between the two figures, it may be estimated at, more or less, land and water, including the channel which separates the island from the continent, at sixty-five thousand plane arpents (65,000.)'' Page 224,

transcript in Mitchel v. United States, 9 Pet. (U. S.) 711. These estimates were not made a part of the grant or of the decree confirming, or of the patent covering the grant of "lands and islands" made to John Forbes & Co., in 1811.

In the briefs of counsel for appellants it is stated that the tract of land west of the mouth of the Apalachicola river including St. Vincent's Island "was estimated to contain 65,000 arpents and by actual survey according to the plat 54,000 acres," and "includes the submerged lands within" lines marked on the plat. According to the plat the total area of the grant to John Forbes & Co. is 140,609.25 acres. The estimated areas of the three separated tracts included in the grant to John Forbes & Co. in 1811, are stated to be 82,500 acres, 18,500 acres, and (according to counsel) 54,000 acres, which make a total of 155,000 acres, when the plat shows a total of only 140,609.25 acres as having been included in the patent confirming to Colin Mitchel the grant made to John Forbes & Co. in 1811. This bears on the question whether the submerged lands between the mainland and St. Vincent's Island were in fact included in the grant or in the survey or the patent confirming the grant of "lands and islands" to John Forbes & Co. in 1811.

"On the discovery of the American continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire. Its vast extent offered an ample field to the ambition and enterprise of all; and the character and religion of its inhabitants afforded an apology for considering them as a people over whom the superior genius of Europe might claim an ascendency. The potentates of the old world found no difficulty in convincing themselves that they made ample compensation to the inhabitants of the new, by bestowing

on them civilization and Christianity, in exchange for unlimited independence. But, as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated as between themselves. This principle was, that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.

"The exclusion of all other Europeans, necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it. It was a right with which no Europeans could interfere. It was a right which all asserted for themselves, and to the assertion of which, by others, all assented.

"Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

"In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it.

"While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy.

"The history of America, from its discovery to the present day, proves the universal recognition of these principles.

"Spain did not rest her title solely on the grant of the Pope. Her discussions respecting boundary, with France, with Great Britain, and with the United States, all show that she placed it on the rights given by discovery. * * *

"However extravagant the pretension of converting the discovery of an inhabited country into conquest may appear; if the principle has been asserted in the first instance, and afterwards sustained; if a country has been acquired and held under it; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned. So, too, with respect to the concomitant principle, that the Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others. However this restriction may be opposed to natural right, and to the usages of civilized nations, yet if it be indispensable to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may, perhaps, be supported by reason, and certainly cannot be rejected by courts of justice." Johnson v. McIntosh, 8 Wheat. (U. S.) 543, text 573, 574, 592.

Upon the discovery of the American continent, the principle was asserted or acknowledged by all European nations, that discovery followed by actual possession gave title to the government by whose subjects or by whose authority it was made, not only against other European governments, but against the native Indians themselves. While the different nations of Europe respected the rights of the natives as occupants, they all asserted the ultimate dominion and title to be in themselves. 31 C. J. 497; Johnson v. McIntosh, 8 Wheat. (U. S.) 543, 5 L. Ed. 681; Hayt v. United States, 38 Ct. Cl. 455; Breaux v. Johns, 4 La. Ann. 141, 50 Am. Dec. 555; *In re* Narragansett Indians, 20 R. I. 715, 40 Atl. Rep. 347; Thompson v. Doaksum, 68 Cal. 593, 10 Pac. Rep. 199.

In the United States the rights of the European discoverers, having been succeeded to by the States or by the general government, the Indian title to land is a right of possession and occupancy, the fee being in the general government, or in the original State where the land is situated. 31 C. J. 497, 498; Nadeau v. Union Pac. R. Co., 253 U. S. 442, text 446, 40 Sup. Ct. Rep. 570; Beecher v. Wetherby, 95 U. S. 517. This was the law of Spain. 16 How. (U. S.) 203; 31 C. J. 498.

WHITFIELD, P. J.—The amended bill of complaint herein, filed September 19, 1921, by appellants here, alleges "that complainants the Apalachicola Land and Development Company, a Declaration of Trust, H. L. Flowers, H. D. Marks, S. E. Rice, Jr., R. R. Rice, C. E. Smith, Jos. Messina, J. J. Abbott, H. B. Robbins and W. H. Collier, Trustees, are the owners in fee simple of, and the Complainants N. R. Hays, S. E. Teague and H. L. Oliver, interested in by mortgage held by them, to the following

described real estate, situate, lying and being in the County of Franklin and State of Florida, to-wit:

"Fractional sections seven (7), eight (8), nine (9) and ten (10), in township 9 south, range 8 west; fractional sections nine (9), eleven (11), twelve (12), seventeen (17) and eighteen (18) in township 9 south, range 9 west; fractional sections thirteen (13) and fourteen (14) in township 9 south, range 10 west; and all the submerged lands lying south of the mainland of said fractional sections, from the water boundary line of said sections to the channel of Apalachicola bay; together with all the rights, privileges and appurtenances thereto belonging or in anywise appertaining.

"2. That the said sections of land have a water boundary on the south by the Bay of Apalachicola, which is a body of water, lying between the mainland and St. Vincent's Island, and the western end of St. George's Island; that the space between the said water boundary and the said sections of land, and the channel of said bay, is composed of shallow flats, of mud and sand bottoms, and in some places small oyster bars; and in low tide considerable area is uncovered, and in ordinary high tide is submerged in water depth, from a few inches near the mainland to about five feet in the middle of the channel, and small boats ply the said channel, which do not draw more than two and three feet of water; that the bottoms of said submerged lands in the space aforesaid is well adapted for the cultivation of oysters and clams, there being some natural bars of small dimensions thereon.

"That the whole of said lands including the Bay of Apalachicola is embraced within, and form a part of what is known as "Forbes Purchase,' said purchase being composed of two certain tracts of land, one of which was granted and conveyed by the Talapoosa and Seminole

Indians to Panton-Leslie & Co., in 1804 and 1806, and the other granted and conveyed by the Lower Creek and Seminole Indians to John Forbes & Co., in the year 1811; the lands herein being a part of the grant to John Forbes & Co., said grants are fully reported in the '4th American State Papers,' pages 86 to 94, inclusive, and under and through said grants and conveyances, the complainants claim title to said lands, and the space between the water boundary line of said sections and the channel of the Bay of Apalachicola, with the appurtenances thereunto belonging.

"That the tract of land granted and conveyed by the Lower Creek and Seminole Indians to John Forbes & Co. is described as follows:

"Having begun at the mouth of the river Apalachicola, and following the line on the west margin, it ascends the Lake Weimico, three miles from its entrance, which spot is known by two cypresses marked with crosses; and thence, through the hammock, the distance of one chain, south to a cypress marked; here it was found impracticable to trace the line further, on account of the bad way, but it should run south 72 degrees west, a supposed distance of 1,280 chains, where a pine is marked; thence south 30 degrees, west 100 chains, to a pine marked with a cross, on the margin of a reedy marsh; thence the line runs by water, one mile and a quarter, south 14 degrees west, to the extreme western point of St. Vincent's or Deer Island, including the whole of the island;" thence ascending the river Apalachicola, and beginning the line at the boundary of the lands formerly ceded to tne nouse of Panton, Leslie & Co. &c.

"That both of said grants and conveyances were confirmed by the Spanish government, and John Forbes who had succeeded to the House of Panton, Leslie & Co., and

who was the directing partner of said House, by his attorney in fact Charles Reggio, on the 29th day of May, 1819, sold and conveyed to Colin Mitchel, the whole of the said tracts of land, so granted and conveyed to Panton, Leslie & Co., and John Forbes & Co., described above, and Colin Mitchel and others who had become associated with him in the ownership thereof, in the year 1828, filed their petition in the Superior Court of Middle Florida, for confirmation of their title to said lands, pursuant to an Act of Congress providing for such confirmation, and upon a hearing thereof before said Court, the claim of petitioners was held invalid, and an appeal was taken to the Supreme Court of the United States, and by an opinion rendered by said Supreme Court in the year 1835 in said cause, the decision of the Superior Court was reversed, and the title of petitioners to said lands confirmed, and by said decree of said Supreme Court of the United States, in said cause, the Clerk of said Court was directed to certify the same to the Surveyor General of Florida, with directions to survey and lay off the lands described in the petition of the claimants, according to the lines and boundaries and description thereof in the several deeds, of Cession Grant and confirmation by the Indians or Governor of West Florida filed as exhibits in the cause, and that the same was certified to the Surveyor General as aforesaid, and the said tracts were surveyed, and plat thereof made by said Surveyor General, confirmed, and patent issued by the United States Government to said Colin Mitchel and his associates, all of which more fully appears, by the patent and the plat attached thereto and made a part thereof, a copy of which is hereto attached and marked exhibit 'A.'

"That on the 28th day of November, 1835, after the confirmation of said grants by said Supreme Court as aforesaid, Colin Mitchel and his associates as owners of

said lands, organized themselves into an association called the Apalachicola Land Company, and by the Articles of Association, trustees were elected to take title to said 'Forbes Purchase' for the benefit of the owners, and a deed was executed by all the proprietors of said 'Purchase,' to said trustees, respectively Louis McLane, Charles Augustus Davis and Joseph M. White.

"That on November 29th, 1838, by amendment of the said Articles of Association, George Griswold and Lewis Curtis were elected trustees, and deed was executed by McLane, Davis and White, to said Griswold and Curtis, trustees.

"That on November 28th, 1843, by amendment of the Articles of Association, Joseph DeLafield and Lewis Curtis were elected trustees and deed was executed by George Griswold to said DeLafield and Curtis, trustees;

"That on the 21st day of June, 1853, by amendments of the Articles of Association, Lewis Curtis and Nathaniel Thurston were elected trustees, and deed was executed by Joseph DeLafield to said Curtis and Thurston, trustees;

"That on the 18th day of April, 1857, by virtue of a suit of foreclosure in the Western Circuit of Florida in Franklin County, wherein George Gar was complainant and Lewis Curtis and Nathaniel Thurston trustees of the Apalachicola Land Company were defendants, a decree was issued in said cause appointing Charles Ellis receiver of the lands belonging to said company, with the directions to sell and execute deeds to purchasers thereof, to all the lands which had not been sold by the said trustees, and to carry out all contracts made by the said trustees for the purchase of lands, and to receive the money therefor, etc.; and executed his deed to Thomas Orman, to the whole of fractional township 9, range 9 south and west, also the whole of township 9, range 10 south and west, also section

426     SUPREME COURT OF FLORIDA.

Apalachicola L. & D. Co. et al. v. McRae et al.—Opinion of Court.

six (6) and fractional section seven (7) in townhsip 9, range 8 south and west; that said fractional townships, include the lands described in this bill; and by said conveyance the title to the submerged lands aforesaid became vested in the grantee therein in fee simple, there being no reservation of said submerged lands in said conveyance; and that the complainants herein succeeded to the title of said Thomas Orman, through and by virtue of deeds and conveyances in regular and unbroken chain of title, duly recorded in Franklin County, Florida.

"That the complainants have expended and invested large sums of money in the property described herein, and the complainants have expended large sums of money preparatory for planting and cultivating oysters and clams, on the submerged bottoms aforesaid;

"4. That in the year 1913, the legislature of the State of Florida passed An Act, creating the Shell Fish Commission, wherein it provided among other things, that the Commissioner of Agriculture is vested with the power and authority to make and execute leases to the submerged lands belonging to the State, for oyster and clam culture, and to make rules and regulations governing same, and provided also for a Shell Fish Commissioner, whose duties are prescribed by said Act, among which is police powers;

"5. That the said defendant, W. A. McRae, Commissioner of Agriculture, acting under the statutes of the State of Florida relative to the Shell Fish Commission, pretend that the aforesaid submerged lands are State lands, and that he has authority to lease the same under said statute for the purpose of fishing, taking, catching, bedding and raising oysters, clams and other shell fish, subject to reservations and restrictions, imposed by said statute; and the said defendant T. R. Hodges, Shell Fish Commissioner, pretends that he has authority under said stat-

ute, to protect, assist and give attention to such leases and grants, as shall be made by said Commissioner of Agriculture to said submerged lands as aforesaid; that the said defendants have made and still are making representations, publicly and privately, that the complainants have no right, title or interest in the aforesaid submerged lands, and no right to cultivate or plant oysters or clams thereon, and by such representations of the said defendants, irreparable injury has resulted, and continues to result to the complainants, by reason of the actions and representations of the said defendants.

"6. That complainants allege, that the said submerged lands, lying and being between the water boundary line of the sections of land herein described and the channel of Apalachicola Bay, were and are included in the valid terms of the aforesaid grants and conveyances of same to private ownership, and are not held by the State of Florida in its sovereign capacity in trust for the lawful uses of all the people of the State, or otherwise; but on the contrary, the title to same is vested in the complainants as aforesaid, and by reason thereof, that the Statutes of the State of Florida relative to the Shell Fish Commision, confers no authority on said defendants, Commissioner of Agriculture and Shell Fish Commissioner, as to said submerged lands, in which title is vested in complainants as aforesaid, and that the said acts and threats of said Commissioner to make leases and making leases, is illegal and without authority of law, and gross interference with the rights and property of complainants, and deprives the complainants of their rights and property without due process of law, and is in violation of the treaty between the United States and Spain and is a cloud on complainants' title and rights, as to said submerged lands;

"8.   That the Act relative to the Shell Fish Commission, delegated the power and authority to the Commissioner of Agriculture to make and execute leases, and the police power delegated to the Shell Fish Commissioner, in so far as the same undertakes to apply to said submerged lands, which is included in a grant to private ownership, is unconstitutional and void.''

The confirmatory patent from the United States made an exhibit to the bill covers "the lands and islands at the west of the mouth of said (Apalachicola) river, which were ceded, granted and confirmed to John Forbes & Co., in 1811.'' See also Mitchel v. United States, 9 Pet. (U. S.) 711.

The prayer of the bill of complainant is that the State officers be "enjoined from leasing and executing leases to and from entering upon, planting or cultivating oysters and clams on any part or portion of the submerged lands situate, lying and being between the water boundary line of fractional sections 7, 8, 9 and 10 in township 9 south, range 8 west, fractional sections 9, 11, 12, 17 and 18 in township 9 south, range 9 west, and fractional sections 13 and 14 in township 9 south, range 10 west and the channel of the Bay of Apalachicola in Franklin County, Florida.'' An appeal was taken from a dismissal of the bill of complaint on sustaining a demurrer thereto, the complainants, having declined to further amend the bill of complaint.

A suit to obviate the effect of an illegal act of an officer as such is not a suit against the State, for the State authorizes legal acts of its officers.   Croom v. Pennington & Evans, 59 Fla. 473, 52 South. Rep. 957 ; Louisville & N. R. Co. v. Burr, 63 Fla. 491, 58 South. Rep. 543, 44 L. R. A. (N. S.) 189, and Notes; Looney v. Crane, 245 U. S. 178, 38 Sup. Ct. Rep. 85; United States v. Lee, 106, U. S. 196, 1

Sup. Ct. Rep. 240; Weyler v. Gibson, 110 Md. 636, 73 Atl. Rep. 261.

Conceding only for the purposes of this case that the allegations of the bill of complaint are sufficient to show a threatened irreparable injury to complainants in the premises, for which an adequate remedy at law is not afforded, the question as to complainants' title to the submerged lands in controversy will be considered. The claim of title is predicated upon an Indian-Spanish grant, not upon the Florida Riparian Act of 1856.

If the complainants have no title to the submerged lands they have no right to maintain this suit. The bill of complaint was demurred to upon grounds including: "6. The said bill does not show that any title ever vested in Colin Mtchell and his associates to the submerged lands of the Apalachicola Bay."

A demurrer in equity does not admit legal conclusions asserted in the bill of complaint, or conclusions of fact not justified by the facts alleged, or assertions of ultimate facts that are not sustained by the facts alleged. See Dillon v. Barnard, 21 Wall. (U. S.) 430; United States v. Ames, 99 U. S. 35; Louisville & N. R. Co. v. Palmes, 109 U. S. 244, 3 Sup. Ct. Rep. 193; Hitchcock v. Buchanan, 105 U. S. 416; Pennie v. Reis, 132 U. S. 464, 10 Sup. Ct. Rep. 149; Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S. 569, 11 Sup. Ct. Rep. 656; this is particularly so when the right asserted as a conclusion depends upon unusual provisions of law and proceedings thereunder and no such provisions and proceedings are made to appear. Kansas v. Colorado, 185, U. S. 125, 22 Sup. Ct. Rep. 552; Symmes v. Prairie Pebble Phosphate Co. 64 Fla. 480, 60 South. Rep. 223; Brown v. Avery, 63 Fla. 355, 58 South. Rep. 34. Even if in this State lands below high water mark may be the subject of private ownership, such a right would be a

most unusual and extraordinary one that should be particularly shown when claimed in a suit. Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221.

It is settled law in this State that private ownership of lands bordering on navigable waters extends only to high water mark. If under valid Spanish grants or otherwise private ownership is claimed in lands below the high water mark, the sources and authority for such claimed ownership should be made to appear by proper allegations and exhibits or by reference to matters of which judicial notice is taken. Since under the Spanish law as well as under the law of this State private ownership of uplands stops at high water mark on navigable waters, except perhaps, under special and particular provisions and action of sovereign governmental authority, those claiming ownership below high water mark must show the sources and muniments of title from competent authority to make such a grant against the rights of the public in the shores of navigable waters in this State. See Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692; Mayor & Aldermen of City of Mobile v. Enslave, 9 Porter (Ala.) 577, 16 Pet. (U. S.) 234, 10 L. Ed. 948; Brickell v. Trammell, supra.

It is alleged that pursuant to judicial proceedings, Charles Ellis, as reeciver, "sold and executed his deed to Thomas Orman, to the whole of fractional township 9, range 9 south and west, also the whole of township 9, range 10 south and west, also section six (6) and fractional section seven (7) in township 9, range 8 south and west; that said fractional townships include the lands described in this bill; and by said conveyance the title to the submerged lands aforesaid vested in the grantee therein in fee simple, there being no reservation of said submrged lands in said conveyance; and that the complainants herein succeeded to the title of said Thomas Orman, through and by

virtue of deeds and conveyances in regular and unbroken chain of title, duly recorded in Franklin County, Florida.'

The deed of coveyance alleged to have been executed by Charles Ellis receiver is not in the record, and it does not appear from the above quoted allegations as to such deed of conveyance that it in fact and in law did convey or even purport to convey title to submerged lands that may be within or adjacent to the described fractional sections. The allegations "that the submerged lands lying and being between the water boundary line of the sections of land herein described and the channel of Apalachicola Bay, were and are included in the valid terms of the aforesaid grants and conveyances of same to private ownership,". and that "by said conveyance the title to the submerged lands aforesaid became vested in the grantee therein in fee simpl, there being no reservation of said submerged lands in said conveyance," are legal conclusions not supported by allegations of fact or by matters duly exhibited or of which the court may take judicial notice, (Byrne Realty Co. v. South Florida Farms Co., 81 Fla. 805, 89 South. Rep. 318) ; and the alleged deraignment of the title to the submerged lands cannot be effective unless the Indian-Spanish grant of 1811 referred to and quoted from in the bill of complaint in legal effect covers and includes such submerged lands.

The source of complainants' title is alleged to be a grant or concession from the Lower Creek and Seminole Indians to John Forbes & Co., which grant it is alleged was confirmed by the Spanish authorities in 1811, and leave given to transfer it to Colin Mitchel; and the same, together with other grants of lands and islands to Panton, Leslie & Co., and of an island to John Forbes, were thereafter confirmed by the United States to Colin Mitchel *et al.*    See Mitchel v. United States, 9 Pet. (U. S.) 711.

Where private ownership is asserted in property that

under the law is a subject of common or public use, the claimant must clearly show that the private exclusive right that is asserted was lawfully acquired through competent authority in the premises. See Symmes v. Prairie Pebble Phosphate Co., 64 Fla. 480, 60 South. Rep. 223; Brickell v. Trammell, 77 Fla. 544, text 563, 82 South. Rep. 221.

When Spain acquired territory by discovery or conquest, in North America the possessions were vested in the Crown; and grants or concessions of portions thereof were made according to the will of the Monarch. While the civil law was the recognized jurisprudence of Spain and its rules were generally observed, yet the Crown could exercise its own discretion with reference to its possessions. The Indians could make no grant or cession of lands in the Floridas except by the dominant authority of Spain during the Spanish Dominion.

Ordinances and edicts that had the force of laws were promulgated to be observed in the Spanish Provinces in America; and these included authority to designate officials to make or confirm cessions of land. The right of the Indians to occupy for their accustomed habitation and tribal purposes the lands they occupied when the Provinces of Spain were established in America, was recognized by the Spanish Monarch; and while the ultimate title and right of disposotion of lands and waters in the provinces were vested in the Crown, the Indians were permitted to cede their recognized right of perpetual occupancy in the lands, to private ownership, provided such cession was agreeable to and confirmed by the Spanish Monarch or by his authority, the policy of Spain being to make or confirm grants, and as to the Indian grants of lands, to perfect title in accepted grantees for purposes of settlement and cultivation by others than Indians. 16 How. (U. S.) 203, 229. See 31 C. J. 497; 33 Am. Dec. 325; 3 Am. Dec. 683; 5 Am.

Dec. 555; 8 Wheat. 543; 126 N. Y. 122; 95 U. S. 517, 525; 253 U. S. 442-6; 19 Wallace 591.

Under the civil law in force in Spain and in its provinces when not superseded or modified by ordinances affecting the provinces or by edict of the Crown, the public navigable waters and submerged and tide lands in the provinces were held in dominion by the Crown as *res communes* and used as *res omnium,* and sales and grants of such lands to individuals were contrary to the general laws and customs of the Realm.

One of the Spanish and Colonial laws was: "No tract of land for new settlements shall be granted or taken by agreement in any seaport; nor in any part which might, at any time, be prejudicial to our royal Crown or to the republic, our will being that they be reserved to us." See 2 White New Recompilation of Spanish Land Laws, p. 46.

By the laws and usages of Spain the rights of a subject or of other private ownership in lands bounded on navigable waters derived from the Crown, extended only to high water mark, unless otherwise specified by an express grant. And though the Spanish possessions in America were held by the Crown to be disposed of at will, a grant or concession of lands under navigable waters and tide lands was not in accord with usual customs of the Kingdom, such lands and waters being held as *res communes* for the public use; and a conveyance of them to private ownership could be consummated only by a clear showing of express sovereign intent (See Jover y Costas v. Insular Government of the Philippine Islands, 221 U. S. 623, 31 Sup. Ct. Rep. 664); and even this would not exclude the public use of the lands and water and the natural products thereof, except and until the lands were reclaimed and improved for other useful purposes under Crown grants.

The difference in the nature and uses of uplands and of lands under navigable waters, including the shore and tide lands, and the manner and purposes of their dominion by the Sovereign, permitted sales and grants of uplands to private ownership for purposes of cultivation and improvement as a matter of State policy to encourage development; but as the navigable waters and lands thereunder were necessary for public purposes and their ownership by private parties would be detrimental to the public good, no such private ownership was contemplated or permitted unless it was expressly authorized by the Crown to promote a public purpose, and then the public use was excluded only in so far as the private grant was in fact utilized as expressly authorized to serve a useful public need or advantage.

There appears to have been no material difference between rights of the Indians under British dominion and under Spanish dominion concerning lands occupied by the Indians and their rights to cede such possessory rights with the consent of the dominant sovereign. Mitchel v. United States, 9 Pet. (U. S.) 711, text 745 et seq.

The title of the Indians to the lands in the provinces of East and West Florida under the Spanish Monarchy was in the nature of a possessory right, held in common according to prevailing customs and tribal dominance among the Indians, subject to the sovereign dominion of the Crown. Johnson and Graham's Lessee v. McIntosh, 8 Wheat. (U. S.) 543; Worcester v. State of Georgia, 6 Pet. (U. S.) 515; Angell on Tide Waters, 49; 14 R. C. L. 123; 22 R. C. L. 237. Appropriations of particular portions of the lands by the Crown for sovereignty purposes were either acquiesced in or enforced as exigencies demanded; and as a rule lands were sold or granted to private parties by the act of the Crown or its representatives pursuant to the laws of Spain with the consent of the Indians through their

chiefs or representatives, or by the act of the Indians with the consent of the Spanish authorities.    See Mitchel v. United States, 15 Pet. (U. S.) 52, text 84; Mitchel v. United States, 9 Pet. (U. S.) 711, text 752.

Under the laws of Spain applicable to its Florida provinces, the navigable waters of the seas and bays were held by the Crown for public common uses of navigation, fishing, bathing, &c.; and in consonance with the prevailing customs and uses, the lands under navigable waters were not ordinarily a subject of private ownership or of grant or sale, and when a conveyance of concession was made to private parties by the Indians subject to confirmation by the duly constituted Spanish authorities, such conveyance or concession had reference to lands embraced in the possessory right or title of the Indians who made the conveyance or grant, and a confirmation thereof was of course confined to the intent and scope of the grant as made by the Indians who were in possession of lands; and the grant did not cover any of the navigable waters of the sea or bays and the submerged lands thereunder, the ownership of which latter was in the Crown of Spain by virtue of its sovereignty over the provinces including all the rights in and to the waters of the sea and lands thereunder that were incident to Spanish sovereignty of the provinces as recognized by the laws of Nations. Moore on Foreshore & Sea Shore, 780; Vattel on Law of Nations, 115; Martin v. Lessee of Waddell, 16 Pet. (U. S.) 367; Angell on Tide Waters, 18, *et seq.;* 1 Farnham on Waters and Watercourses, 229; City of Galveston v. Menard, 23 Tex. 349, text 391; Shively v. Bowlby, 152 U. S. 1, text 13, 14 Sup. Ct. Rep. 548; Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; United States v. Pacheco, 2 Wall. (U. S.) 587.

Under these basic conditions it is clear that descriptions contained in grants of lands made by the Indians for defi-

nitely stated valuable considerations moving to them, must
be regarded as having reference to lands occupied by the
Indians, and not to submerged lands under navigable wa-
ters of the sea or bays, the ownership or control of which
was in the Spanish Crown.  In such cases no consideration
moved to the Crown of Spain for the concession; and con-
firmations of such Indian grants were made to aid the In-
dians in their necessities and to encourage settlement and
cultivation of the lands by others than Indians.    It may
be said that the Indians had tribal rights of possession and
uses in the submerged lands for navigation, fishing, bath-
ing, &c., similar to the rights they had in the lands for
hunting, sporting and habitation purposes; but, as shown
above, the rights of user and disposition were different, and
it does not appear that under the dominant Spanish sove-
reignty and laws that were applicable to the provinces, the
Indians were accorded the same rights to make concessions
of submerged lands under navigable waters that were pecu-
liarly the property of the Crown for public purposes, as
they were accorded to make sales or grants of uplands with
the permission of the Crown or its proper officers.   Cer-
tainly if a grant by the Indians covers submerged lands
under navigable waters of the sea or bays, it must specifi-
cally so state or otherwise plainly indicate such an intent so
as to apprise the Spanish authorities of the nature of the
grant desired to be confirmed, otherwise the grant made
and confirmed will be held to cover only uplands or such
lands as were usually occupied by the Indians and as to
which concessions made by the Indians would be con-
firmed by the Spanish sovereignty.   See Moulton v. Libbey,
37 Me. 472, 59 Am. Dec. 57.

It cannot reasonably be conceived that the Monarchy of
of Spain would by implication or intendment, not clearly
shown by express terms, confirm a concession to private

ownership of submerged lands that would yield a right
to exclude the public from any of the rights of navigation,
fishing, &c., in the bays of the sea. Taking oysters, which
are shell fish, involves a right in submerged lands and the
waters over them; (Martin v. Lessee of Waddell, *supra;*
Angell on Tide Waters, 33; Bagott v. Orr, 2 Bos. & Pull.
472; Peck v. Lockwood, 5 Day (Conn.) 22; and this right
was common to the public under Spanish rule as well as
under English and American government; and conces-
sions of lands do not cover submerged lands under nav-
igable tide waters, at least unless so expressly declared or
shown by competent authority, even if the exterior boun-
dary lines of the lands, which are on both sides of a nav-
igable tide water bay of the sea, run across the bay in
reaching the land on the opposite side to be delineated as
a part of the concession. See Hynes v. Packard, 92 Tex.
44, 45 S. W. Rep. 562; Rosborough v. Picton, 12 Tex. Civ.
App. 113, 34 S. W. Rep. 791. See also Peck v. Lockwood,
5 Day (Conn.) 22, text 28; Moulton v. Libbey, 37 Me. 472.
This is peculiarly so when the documents involved in
making and confirming the grant show the purpose of the
grant made by Indians for a consideration moving solely
to them, was to convey lands occupied by them, and also
show that the intent of the confirmation of the grant by
the dominant sovereign was to accommodate the Indian oc-
cupants and to encourage settlement and cultivation of
lands.

Concessions to private ownership of submerged lands
under navigable tide waters that would curtail or exclude
the use by the public and by riparian owner of the navi-
gable waters and the lands thereunder adjacent to the up-
lands, would hamper or prevent rather than encourage the
settlement and cultivation of the lands intended to be
granted for cultivation. See generally Sullivan v. Rich-

ardson, 33 Fla. 1, 14 South. Rep. 692; Ex Parte Powell, 70 Fla. 363, 70 South. Rep. 392; Hagan v. Campbell, 8 Porter (Ala.) 9, 33 Am. Dec. 267; Pollard v. Hagan, 44 U. S. *212, 220.

The grant or conveyance here considered is a concession, i. e. a yielding by the Indians (for a stated consideration moving to them and not to the Crown of Spain) of their possessory right in lands they occupied and a confirmation by Spain, the dominant monarchy, of the concession as made. Such a conveyance necessarily is of property not sovereignty, and relates to private ownership in lands for private purposes; and the conveyance has an effect essentially different from a ceding, i. e. a transfer of territory from one sovereign to another, the latter generally including "full property and sovereignty" in the premises as in the ceding of the Floridas to the United States by Spain. See also Morris v. United States, 174 U. S. 196, 19 Sup. Ct. Rep. 649.

It is universally recognized law that grants of lands to private ownership do not include lands under navigable waters or tide lands unless such an intent clearly appears from acts of competent authority to pass title to such lands; and in view of the right of the public in the use of such submerged and tide lands, a grant of title to private ownership does not destroy, even if it may curtail the public uses until the lands are lawfully reclaimed and improved in due course of lawful permission to so deprive the public of their inherent common rights. See City of Galveston v. Menard, 23 Texas 349; Martin v. Lessee of Waddell, 16 Pet. (U. S.) 367; Morris v. United States, 174 U. S. 196, 19 Sup. Ct. Rep. 649.

Under the laws of Spain that were applicable to its colonies and provinces at and prior to the cession of East and West Florida by Spain to the United States in 1819,

the submerged lands under navigable waters within the sovereign dominion of the Kingdom were subjects of common use by the public; and such lands could not be converted to exclusive private ownership except by grants or concessions made by or expressly authorized by the Crown. And such grants must be strictly construed against the grantee for the protection of the public.  Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692; Ex Parte Powell, 70 Fla. 363, 70 South. Rep. 392; Hagan v. Campbell, *supra.*

The court takes judicial notice of the "American State Papers" which relate to Spanish concessions or grants confirmed or otherwise acted on pursuant to Acts of Congress. Thiesen v. Gulf, F. & A. R. Co., 75 Fla. 28, 78 South. Rep. 491; Sullivan v. Richardson, *supra.*

On page 91 of 4 American State Papers record is made of a report to the United States Government, by its commissioners relative to the grant in question, as follows:

The commissioners had received "a copy of a petition from John Innerarity to Governor Folch, dated Pensacola, 7th June, 1811, begging him, in consequence of every previous formality having been observed for obtaining a cession of two pieces of land from the Lower Creek Indians in payment of certain debts the latter owed the house of John Forbes & Co., to interpose his authority for the ratification of said cession.  Also, a copy of a decree of Governor Folch, as follows:

"Pensacola, 8th June, 1811.  The petitioner's request granted *on conditions the said John Forbes and Co. do not dispose of or alienate the land in question without the express consent of this Government, and that the same be understood to be on the same footing with the cession for which a title was granted on 3d December,* 1806.

Folch.

"Also an original certificate of Francisco Maximiliano de San Maxent, political and military governor of West Florida, (ad interim), countersigned by Pablo de Larin, secretary of the government, and dated the 20th December, 1811, stating that the foregoing pieces are faithfully copied from the original proceedings which exist in the office of the secretary of this government, of which an original title has been given to John Innerarity, as agent of the house of John Forbes & Co. Also, an original title of confirmation by Governor Folch, as follows:

"Whereas, John Innerarity, agent of the house of John Forbes & Co. (*established in this province, with royal approbation for trading with the Indians since* 1785,) presented me, on the 7th of this month, a petition importing that, in consequence of a congress of chiefs, &c., of the Lower Creek nations of the rivers Flint and Chattahoochee, held in this place on the 22nd of January last, presided by me, in order to agree upon the manner of satisfying said house for the sum of nineteen thousand three hundred and eighty-seven dollars four and a half rials, owing to it by the dealers and Indians of said villages, as appears by an account presented by the said house, and which is ordered to be annexed by the proceedings; at which congress were present the following chiefs, viz: Tuskamiecky Hopoi, Coweta Mico, Cowata Tuskania, Hothepoi Mico, Yahu Hadjoo, Mico Napa, Tuskanucky Chachuany, Ufala Mico, Hapoi Mico, Yohulla Emathla, Efa Mico, Toothia Tuskanucky, with James Gurosseau, interpreter of said Indians, and Manuel Gonzalez, interpreter of this Government; and referring to the resolutions passed in the month of April of the preceding year, 1810, in the village of Tuskattoloofa, they consented and agreed, as a compensation and payment of the aforementioned debt, *to the cession and transfer of two pieces of land contiguous and*

*adjacent* (italics supplied) to that which, in 1806, for a like reason, was ceded by the said chiefs to the house of Panton, Leslie & Co., which present act of cession was drawn out in the English language, because many of said chiefs understood that language, and signed by them and by the interpreters after having fully and circumstantially informed the said chiefs of the contents of the same, and then annexed to the proceedings, with its translations into Spanish, under Nos. 2 and 3; and the said chiefs having assembled together in April last at Prospect Bluff, on the Apalachicola river, for the ratifying said cession or transfer, they appointed deputies to assist at the running out and marking of the *boundary line of the said lands,* which they executed, signing another deed, which appears with its translation under Nos. 4 and 5, in which are to be found the names of the following chiefs, viz. Hopoi Mico, Tohallo Emathla, Capichy Mico, Hopoi Cuichei, Micasuky Tuskania, Coweta Emathla, Yohallo Hadjoe, Niony Homughta, Tuskanuky Chackchucky, Tusky Hadjoe, John Meally, and those of Daniel Blue, deputy surveyors, William Hambly, interpreter, and Edmund Doyle, agent of the said John Forbes & Co., and the said deed legalized by the certificate of the commandant of Fort St. Marks, of Apalachy, Don Marcos de Villiera, before two assisting witnesses, the 25th May last, I ordered it, with its translation, to be also annexed to said proceedings, together with the act passed before the said commandant at Fort St. Marks, under No. 6, in which the deputation of chiefs, composed of Capitza Mico Kinache, Catha Tuskanuky, Asa Mico, Cosahotcha, Yaholla Emathla, Tulsihatcho, and Ninihumatee Tustunuky, declare fully to have assisted the surveyor, Daniel Blue, the interpreter, William Hambly, and Edmund Doyle, agent of said house, in running and making the *boundary line of said land,* in order to avoid all

doubts or difficulties, and that in no future time there may be any whatever, they state, "having begun at the mouth of the river Apalachicola, and following the line on the west margin, it ascends the Lake Weimico, three miles from · its entrance, which spot is known by two cypresses marked with crosses; and thence, through the hammock, the distance of one chain south to a cypress marked; here it was found impracticable to trace the line further, on account of the bad way, but it should run south 72 degrees west, a supposed distance of 1,280 chains, where a pine is marked; thence south 30 degrees, west 100 chains, to a pine marked with a cross, on the margin a reedy marsh; thence the line runs by water, one mile and a quarter, south 14 degrees west, to the extreme western point of St. Vincent's or Deer Island, including the whole of the island" thence ascending the river Apalachicola, and beginning the line at the boundary of the lands formerly ceded to the house of Panton, Leslie & Co., &c. * * * And the chiefs Nocosa Hopoy, Corva Emathla, Tustanuky Hacho, Mico Hatcho, and Nocosa Hatcho, having ascertained the boundary line, approved of and consented to it, although •they were not assisting at running it out and marking it, and signed it in presence of the commandant of the Fort St. Marks, witnesses and interpreters, as appears at the end of document No. 6. And the accounts having been presented of the expenses attending the proceedings instituted, which amounts to $3,492 6½ rials, I have ordered it to be annexed to the proceedings under No. 7, and I made a decree, in consequence of the above mentioned petition, to the following effect: "Granted, as the petitioner's request, on conditions that the said John Forbes & Co. may not dispose of, nor alienate *the land* in ' question without the express consent of this Government, and that its concession is to be understood to be

on the same footing with that for which a title was given on the 3rd December, 1806.'' In consequence, the said John Innerarity, as agent and attorney for the house of John Forbes & Co., concludes his said petition, begging me to interpose my authority in due form for the ratification *of the said cession of two pieces,* of which is designated by the surveyor general of this province, Don Vincente Sebastian Pintado, in the figured plat made out by him, and annexed to the original proceedings. Wherefore, making use of the faculties conferred on me by our lord the King, and in his royal name, I confirm and ratify to the said John Forbes & Co. the cession *of two pieces of land* above designated, made by the nation of Seminole Indians, or Lower Creeks, represented by its principal chiefs, leaders, and considerable men, amply empowered; and I, give them power to *enter into possession of the said lands* according to the directions, dimensions, and distances, contained in the figured plat and certificate of survey, the original documents of which, with a copy of said plat, shall remain in the office of the secretary of this Government, the said Surveyor enregistering not only this title, but also that delivered in the year 1806, from the same motives, and that of the island conceded to John Forbes individually, in order that his archives may contain every thing concerning these concessions, and the motives from whence they originated, and I declare and impart to the said house of John Forbes & Co. *entire and direct property,* that as such, they may the *said lands, enjoy, possess, cultivate, sell or alienate,* on the conditions expressed in my decree inserted in this title. In witness whereof, I have ordered the present to be expedited, signed by my hand, sealed with my arms, and countersigned by the secretary of this Government. (Italics supplied.) Given in Pensa-

444     SUPREME COURT OF FLORIDA.

Apalachicola L. & D. Co. et al. v. McRae et al.—Opinion of Court.

cola, this 5th June, 1811.  *Vincente Folch.*  By order of
the governor.  Pablo de Larin.

Also, a copy of the opinion of the assessor general, as
follows: May it please your Excellency: *The lands which
were occupied by Indians of the Seminole tribe,* lying in
the district of Apalachy and Appalachicola, *and the island
belonging* to the Lower Creek and Seminoles, about seven
miles long, and more than a mile in breadth, together *with
two pieces of neighboring lands,* having been transmitted,
as they actually and lawfully are, in full property, a titulo
one-roso, to the house of John Forbes & Co. established in
the Floridas by royal permission, for which acquisition a
competent permission was given to Don Vincente Folch y
Juan, who was their political and military governor of
West Florida, and who delivered, subsequently, titles of
confirmation in favor of the purchasers.  There is no ob-
stacle to your Excellency's making use of the powers en-
trusted to you, and permitting the alienation proposed,
among which is designated Don Colin Mitchell, a merchant
of this city, a person uniting all the qualifications neces-
sary for obtaining them; in the instrument of transfer for
appropriation of property, having to be inserted copies of
said titles of confirmation, and the present opinion, if your
Excellency should be in the same sentiments.  Havana,
13th October, 1817.  Donardo del Monte.  Also, a copy of
the decree of the captain general, in the following words:
''Havana, 13th October, 1817.  Agreeably to the preced-
ing opinion of the assessor general, I permit the alienation
*of the lands solicited* by Don John Forbes, in which Don
Colin Mitchell is designated as having the greater part,
drawing out the writing and insertions mentioned in the
said opinion.  Cienfuegos.' ''  (Italics supplied).

This concession to John Forbes & Co., with permission
to alienate it to Colin Mitchell was declared valid by the

Supreme Court of the United States in Mitchel v. United States, 9 Pet. (U. S.) 711. The decree validating the concession here considered, refers to it as "the lands and islands at the west of the mouth of the said (Apalachicola) river, which were ceded, granted and confirmed to John Forbes & Co., in 1811." Subsequent surveys of the contents of the cession or grant were of the lands, thus indicating that the grantees and their successors in title understood no submerged lands under navigable or tide waters were included or intended to be included in the grant or cession as made or as confirmed by Spain or the United State.

From the above quotations it is manifest that even if the Indians had a right to cede and the Spanish officers a right to confirm a cession to private ownership of submerged lands, such as lands below high water mark on navigable waters or tide lands covered and uncovered daily by the tides, the cession to John Forbes & Co. in 1811 as made, by its terms covers only "lands" and an "island," and does not expressly include, or, considering the nature of the subject and the rights therein, does not by fair implication or intendment include submerged lands, *i. e.* lands under navigable waters or tide lands. The particular description has reference to "running and marking the boundary line of said land." The description that is pertinent to the *locus in quo* follows "the line on the west margin" of the Apalachicola river; and after other calls the line runs from "a pine (tree) marked with a cross on the margin of a reedy marsh; thence *the line runs by water*, one mile and a quarter, south 14 degrees west, to the extreme western point of St. Vincent's or Deer Island, including the whole of the island." In locating another tract of land included in the grant the line runs "thence ascending the river Apalachicola, and *beginning the line*

*at the boundary of the lands* formerly ceded to the house of Panton, Leslie & Co." This description encircles the land in controversy where the line reaches Apalachicola River from the eastern end of St. Vincent's Island, and it is clear that the calls relate to lands and not to water or to submerged lands. The call "thence *the line runs by water*, one mile and a quarter, * to the extreme western point of" the named island, then "including the whole of the island," with no other call except "thence ascending the river * *and beginning* the line at the boundary of the lands," &c. when considered with the repeatedly expressed purpose of the cession to grant "*land*," make it manifest that there was no attempt to grant or cede or convey anything but land. The words used in the description is on leaving the mainland, "thence the line runs by water, one mile and a quarter" to land on the island, and the concluding call from the island "thence ascending the river Apalachicola, and *beginning* on the line at the *boundary* of the lands formerly ceded," &c., plainly shows that the lines over the bay were delineated merely to determine the end of the line on the mainland and the location of the line as it touched "the extreme western point of St. Vincent's or Deer Island."

After reaching the island, the description then is, "including *the whole of the island*," which embraces only land. After this, the instruction given for finding the beginning of the second tract of land which is many miles away, is "thence ascending the river Apalachicola and *beginning the line at the boundary of the lands*," &c. Thus the descriptions contained in the cession include lands within designated lines actually run on the mainland and also "the whole of" an island separated from the mainland by at least "one mile and a quarter" of water, which it appears is a part of Apalachicola Bay, a navigable body of water which extends southwest from the mouth of the Apa-

lachicola river and also extends beyond the river east and north. And the description does not purport to include any submerged lands lying under the waters over which "the line runs by water" after leaving "a pine (tree) marked with a cross on the margin of a reedy marsh;" nor does the description include any submerged lands on either side of the channel or body of water lying between St. Vincent's Island and the mainland at any point between the western line from the mainland run over the water "to the extreme western point of St. Vincent's or Deer Island" and the eastern extremity of St. Vincent's Island.

During the British ocupancy under the Treaty of Paris from 1763 to 1783, the country then known as Florida was divided into East and West Florida, with the Chattahoochee and Apalachicola rivers as the eastern boundaries of West Florida.

By the Treaty of Paris of 1783, Florida reverted to Spain, the divisions of East and West Florida being continued. Eventually the Northern boundary of West Florida was fixed at the line of 31 degrees North latitude and the western boundary was located at the Perdido river. Mitchel v. United States, 9 Pet. (U. S.) 711, text 761.

From 1783 to 1821 the provinces of East and West Florida were subject to Spanish dominion. The country was inhabited by Indians, but they could grant lands only by consent of the proper Spanish authorities and pursuant to Spanish laws. The concession here considered was confirmed in 1811.

Under the law of Spain at that time grants could not be made of submerged lands below high water mark except by the King or by express authority of the King; and the cession to John Forbes & Co. was not made by the King or by any one expressly authorized by the King to grant submerged lands; and a cession of submerged lands under

navigable waters was contrary to the laws of Spain in force in West Florida at the time the cession was made. Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; Morris v. United States, 174 U. S. 196, 19 Sup. Ct. Rep. 649; United States v. Pacheco, 2 Wall. (U. S.) 587; Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; Richardson v. Louisville & N. R. Co., 169 U. S. 128, 18 Sup. Ct. Rep. 268; San Francisco Sav. Union v. Irwin, 28 Fed. Rep. 708; Rosborough v. Picton, 12 Tex. Div. App. 113, 34 S. W. Rep. 791. Upon the cession of the Floridas to the United States by Spain which became effective in July, 1821, the lands within the territory of East and West Florida became subject to the laws of the United States. State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353.

When the cession was confirmed by patent from the United States the lands under navigable waters were held by the United States for general public purposes, and the patent covering only "lands and islands" did not include submerged lands below high water mark or tide lands. And such is the law of this State. See Mitchel v. United States, 9 Pet. (U. S.) 711, 761; Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; State v. Black River Phosphate Co., 32 Fla. 82, 13 South. Rep. 640; Geiger v. Filor, 8 Fla. 325; Gould on Waters, Sec. 73; City of Tarpon Springs v. Smith, 81 Fla. 479, 88 South. Rep. 613. The patent controls as between the parties here. See Knight v. United States Land Assn., 142 U. S. 161, 12 Sup. Ct. Rep. 258.

The title of the Indians was predicated upon possession or occupancy for the accustomed common purposes of such

people; and they could have had no greater title to lands below high water mark in navigable waters or to tide lands than did the Kingdoms of Spain and England, in each of which sovereignties the title to such lands was held by the Crown for the public uses which the law attached thereto. Brickell v. Trammell 77 Fla. 544, 82 South. Rep. 221; Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692; White's Spanish Laws, 62. The concession made by the Indians to John Forbes & Co., and confirmed by Spanish authorities was obviously not intended to be in excess of the ordinary authority exercised in that way, and it did not purport to convey or to grant submerged lands below high water mark on navigable waters or tide waters; therefore it is not even necessary to invoke the general rule that grants by or for the public to private ownership shall be strictly construed against the grantee. There is nothing in any record pertaining to the matter that tends to indicate a purpose or an attempt to cede or grant or convey submerged lands below high water mark or tide lands. The manifest purpose was to cede the *lands,* that were within the designated boundary lines as they were run on the land. The lines referred to as crossing the bay from the mainland to the western extremity of St. Vincent's Island and from the eastern extremity of the same island, ''thence ascending the river Apalachicola'' are intended to relate merely to the location of the boundary lines of lands on the mainland and on the island, which land lines define the territory or space of land included in the ''concession.''

Even though there is included within the lines as run, or ''within the boundaries of the grant,'' submerged lands, *i. e.,* lands below ordinary high water mark or navigable waters of the bay or tide lands, yet such lands being held for purposes common to the public, ''were not intended to be conveyed'' or granted by the cession, any more than

15—Vol. 86.

were the Fort of St. Marks "and land attached to it by military usage" as in Mitchel v. United States, 15 Pet. (U. S.) 52, 91. There is in the records of the cession made to John Forbes & Co. evidence indicative of an intent to grant lands, but nothing denoting an intent to attempt a grant or a cession of submerged lands under navigable waters or tide lands. The cession of the lands contained within the defined boundaries, carried with it a right to use the submerged lands within the stated lines for proper purposes in conjunction with the rights of the public and subject to regulation under the laws of the governing sovereign having dominion from time to time. The confirmation of the concession by Spain did not affect the Spanish authority as to ownership and regulation of the use of such submerged lands; and the ownership and governing power as to such submerged lands passed to the United States under the treaty of cession of the Floridas to the United States, which became effective upon the transfer of sovereign authority in July, 1821.

By Article II of the "Treaty of Amity, Settlement and Limits" above quoted from, the Kingdom of Spain ceded to the United States "in full property and sovereignty, all the territories" described, "known by the name of East and West Florida," including "the adjacent islands dependent on said provinces;" and by Article VIII of the Treaty of Cession it was expressly provided that "all the grants of *land* made before the 24th of January, 1818, by *lawful* Spanish authorities, "in the said territories, * shall be ratified and confirmed to the persons in *possession of the lands.*" This clearly shows that the exceptions contained in the Treaty related to grants of lands that could be occupied and which were then capable of being held "in possession" by persons under prevailing conditions existing at that time. See United States v. Arredondo, 6 Pet. (U.

S.) 691. If the King of Spain had granted, or had expressly authorized a grant of, submerged lands below high water mark on the bays of the sea, such a grant might under some circumstances carry a bare legal title, but not a right of private ownership in submerged lands under the waters of the bay or sea, thereby excluding navigation, fishing, the taking of oysters or other shell fish, and other purposes in which the public have an interest as of common right, subject to governmental regulation for the good of the public. See Martin v. Lessee of Waddell, 16 Pet. (U. S.) 367; Morris v. United States, 174 U. S. 196, 19 Sup. Ct. Rep. 649. See also Mayor of Galveston v. Menard, 23 Tex. 349, for authorities. But the grant or concession to John Forbes & Co. was not made by the King of Spain or by any one expressly authorized by him for the purpose of transferring to private ownership title to or the beneficial use of any submerged lands below ordinary high water mark on the bay or sea to which the lands granted or ceded were riparian or littoral and no attempt was made by the Indians to grant or by the Spanish authorities to confirm a cession of such submerged lands.

The United States Supreme Court confirmed the grant to "the lands and islands at the west of the mouth of said (Apalachicola) river, which were ceded, granted and confirmed to John Forbes & Co. in 1811," and adjudged the grant to be "valid by the law of nations, the treaty between the United States and Spain, by which the territory of the Floridas was ceded to the former, the laws and ordinances of Spain, under whose government the title originated, the proceedings under said treaty, and the Acts of Congress relating thereto." Only "lands and islands" were held to have been granted to John Forbes & Co. by the Indians and confirmed by Spanish authority.

The confirmatory patent issued by the United States

covers only ''the lands and islands at and west of the mouth of said (Apalachicola) river, which were ceded, granted and confirmed to John Forbes & Co., in 1811.'' The patent controls and does not include submerged lands  See Dean v. City of San Diego, 275 Fed. Rep. 228; Dominguez De Guyer v. Banning, 167 U. S. 723, 17 Sup. Ct. Rep. 937; Knight v. United States Land Ass'n, 142 U. S. 161, 12 Sup. Ct. Rep. 258. See Insular Government of the Phillipine Islands v. Jover y Costas, 221 U. S. 623, 31 Sup. Ct. Rep. 664, for a special grant and the circumstances influencing the decision thereon. The Arredondo grant was of interior lands. United States v. Arredondo, 6 Pet. (U. S.) 691; Axline v. Shaw, 35 Fla. 305, 17 South. Rep. 411.

By ''Treaty of Amity, Settlement and Limits between the United States of America and His Catholic Majesty, the King of Spain, concluded February 22, 1819, ratifications exchanged at Washington, D. C., U. S. A., February 22, 1821, proclaimed February 22, 1821'' it is provided that ''His Catholic Majesty cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the eastward of the Mississippi known by the name of East and West Florida. The adjacent islands dependent on said provinces, all public edifices, fortifications, barracks and· other buildings, which are not private property, archives and documents, which relate directly to the property and sovereignty of said provinces, are included in this article. The said archives and documents shall be left in possession of the commissaries or officers of the United States, duly authorized to receive them'' and that ''all the *grants of land* made before the 24th of January 1818, by His Catholic Majesty, or by his *lawful* authorities, in the said territories ceded by His Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the

same grants would be valid if the territories had remained under the dominion of His Catholic Majesty. But the *owners in possession of such lands,* who, by reason of the recent circumstances of the Spanish nation, and the revolutions of Europe, have been prevented from fulfilling all the conditions of their grants, shall complete them within the terms limited in the same, respectively, from the date of this treaty in default of which the said grants shall be null and void. All grants made since the said 24th of January, 1818, when the first proposal, on the part of His Catholic Majesty, for the cession of the Floridas was made, are hereby declared and agreed to be null and void.'' Articles 2 and 8 of Treaty as shown by Fuller's Purchase of Florida, 1776-1819; State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353.

Subsequent to the Treaty of February 22, 1819, by which Spain ceded to the United States the territories known as East and West Florida, various Acts of Congress were passed for settling private land claims in the ceded territories, pursuant to the above quoted provision of Article 8 of the Treaty providing that ''all grants of land made before the 24th of January, 1818, * * * in said territories * * * shall be ratified, and confirmed to the persons in possession of the lands to the same extent that the same grants would be valid if the territories had remained under the dominion of'' Spain.

The titles to the land were to be ''ratified and confirmed to the persons in possession of the lands.''

After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the constitution and laws of the United States. The lands under navigable waters including the shores were held by the United States for the benefit of the whole people to go to the future State 'for the

use of the whole people of the State; and the State holds title for the purposes of the people of the State. Sec. 12, Act of Congress of March 3, 1823, provides "that all the navigable rivers and waters in the districts of East and West Florida shall be, and forever remain, public highways."

The shores of navigable waters are the spaces between high and low water marks, and the bed of the waters includes the shores. Tide land is that which is daily covered and uncovered by water by the ordinary ebb and flow of normal tides. State ex rel. Ellis v. Gerbing, supra. See also Clement v. Watson, 63 Fla. 109, 58 South. Rep. 25. The expression "Sea-coast" has reference to "land adjacent to the sea or ocean," Webster's Dic.

This is not a case where boundaries refer to a body of water of larger dimension that is intersected by a stream or body of water of a smaller dimension and the line of boundary on the larger waters cross the smaller waters at the points of junction from headland to headland, as where a creek enters a bay. See Knight v. United States Land Ass'n., 142 U. S. 161, 207, 12 Sup. Ct. Rep. 258; San Francisco City & County v. LeRoy, 138 U. S. 656, 11 Sup. Ct. Rep. 364.

The line as delineated in this case, crossed the bay and the line over the water is given for the purpose of showing the water terminus of the line on the mainland and the beginning of the line on the island which lies on the opposite side of the bay from the mainland. The bay is not merely tide water, but is a navigable body of water used for general navigation purposes by the public subject to governmental regulation.

Manifestly the lines that were run on the land and extended over the water between the mainland and St. Vincent's Island and that are referred to in the muniments of

title, were intended to indicate the general exterior limits within which the granted "lands and islands" are located and the *location* of the island with reference to the mainland; and such lines obviously have reference to the "lands and islands at and west of the mouth of said (Apalachicola) river" which were confirmed as intended to be included in the grant or cession that was made and confirmed to John Forbes & Co. in 1811, such "lands and islands" including only the uplands within the general extension lines on the mainland and island to high water mark of the navigable waters upon which such "land and island" abut.

The "Diagram of the Survey" attested by Robert Butler, Surveyor General of the United States, dated January 15, 1842, shows the outlines of "the lands and islands at and west of the mouth of said (Apalachicola) river which were ceded, granted and confirmed to John Forbes & Co., in 1811," and covered by the patent issued by the United States to Colin Mitchell, June 9, 1842. This diagram shows the name "John Forbes & Co.," marked on the part of the mainland included in the survey limits and also on the space representing St. Vincent's Island. The name does not appear in the space representing the submerged lands or tide lands between the mainland and the island, a part of which land is covered by navigable waters leading from Apalachicola Bay to the Gulf of Mexico. The lines and figures that appear in the water space between the island and the mainland indicate the *location* and distance of the island from the mainland. There is nothing in any of the muniments of title or in the plat showing an intent to grant lands under navigable waters or tide lands. The waters of the bay being as obviously in place as are the navigable rivers adjacent to or contained within the limits of the exterior lines of the grant, the grant or cession manifestly had relation to uplands contained within the limits

of the lines run and there was no intent to attempt a conveyance of lands under navigable waters of a bay or tide lands, that are designed for public use.

The manifest intent of the cession or grant and of the confirmation articles as well as of the decree adjudicating the title, was to cover all the ''lands and islands'' that were within the lines as run, the conveyance of such lands and islands for occupancy being within the granting power and purpose; but there is no intent shown by any documents affecting the title to attempt to pass title to navigable waters of the bay or to any submerged lands under navigable waters of the bay, the same being then not subject to exclusive private ownership and possession.

The ascertained arpent or acreage contents of the surveys do not operate to convey navigable waters of the bay and lands thereunder when the title documents disclose no intent to include such submerged lands.   The survey lines determine the limits of land areas, but they do not extend the title to subjects within the lines that were not intended to be covered by the grant or conveyance.

As the records of the cession 4 Am. St. Papers 86 et seq., show that the grantees sought permission of the Spanish authorities to negotiate with the Indians for cessions of lands, and also that John Forbes & Co., asked and obtained from the Spanish authorities confirmations of the grant or cession made by the Indians to John Forbes & Co., and also sought and obtained permission from the Spanish authorities to alienate the lands it is not appropriate to consider treaty rights if any existed between the Indians and Spain as to the ownership of the lands by the Indians in their own dominion.  The deeds made by the Indians do not purport to grant or cede submerged lands, but only lands and islands occupied by the Indians within designated exterior limits.  The lines run over the waters of the bay and

VOL. 86, JUNE TERM, 1923.        457

Apalachicola L. & D. Co. et al. v. McRae et al.—Opinion of Court.

the reference to the sea were intended as a means of show-
ing an intent to include islands south of the mainland
within the lines extending to the sea coast or shore of the
mainland. The patent issued by the United States to Colin
Mitchel et al., pursuant to the adjudication of title, Mitchel
v. Uniter States, 9 Pet. (U. S.) 711, refers to lands and
islands that were ''ceded, granted and confirmed to John
Forbes & Co., in 1811.''

''A grant from a sovereign of land bounded by the sea or
by any navigable tide water, does not pass any title be-
low high water mark, unless either the language of the
grant, or long usage under it, clearly indicates that such
was the intention.'' Shively v. Bowlby 152 U. S. 1, text
13, 14 Sup. Ct. Rep. 548; Morris v. United States, 174 U. S.
196, text 236, 19 Sup. Ct. Rep. 649.

The lands and islands referred to as ''the several tracts
of land'' that are specifically included in the patent, are
described as: ''Bounded on the South and Southeast by the
reservation at St. Marks, the river St. Marks, the Apalachee
Bay, the Gulf of Mexico; on the West by public lands,
namely, (particularly described by fractional townships in
stated ranges) by Lake Wee Mee Coe, and by the Apalach-
icola river; on the North by the middle Sweet Water Creek,
by fractional townships (definitely stated); and on the
Northeast and East by public lands, viz: By fractional
township * * and by St. Marks River, including the follow-
ing islands, namely, Leward Island, Middle Island, South
or Windward Island, Piney Island, Dog Island, St.
George's Island, St. Vincent or Deer Island and Forbes
Island, hereinbefore mentioned,'' excepting described pieces
of uplands.

The Indians were regarded by Spain as its ''subjects.''
Mitchel v. United States, 9 Pet. (U. S.) 711, text 753. And
under the Spanish law applicable to the Florida provinces,

the submerged lands under the navigable waters within the dominion of the Crown, were held by the Crown *res communes* for proper uses of all its people.

The right of the Indians to the lands were of "occupancy and perpetual possession, either by cultivation or as hunting grounds" and of alienation of such right of occupancy and possession, which alienation, when duly made and confirmed by authority of the Spanish Crown, in whom was the "ultimate reversion in fee," "passed the lands in full property to the grantee." See Mitchel v. United States, 9 Pet. (U. S.) 711, text 745, 746, 752, 756. The cession was of "all the right the Indians had retained in the land until that time." Mitchel v. United States, 15 Pet. (U. S.) 52, text 83, 85.

In this case the Indians ceded "a district of land" and "lands and islands" "contained within stated limits" that were then occupied by the Indians who made the cession; and this is the cession that was confirmed by Spanish authorities. It did not include lands under navigable waters or tide lands. This is shown by the muniments of title and by the Surveyor General's diagram or plat pursuant to which the confirmatory patent from the United States was made.

The decree in the case of Mitchel v. United States, 9 Pet. (U. S.) 711, text 762, directs the Surveyor General of Florida "to survey and lay off the lands described in the petition of claimant, according to the lines, boundaries and description thereof in the several deeds of cession," &c., and the diagram of survey and the patent refer to lands and islands which are delineated on the diagram and separated from bodies of water that exist between the lands and islands. The grant to John Forbes & Co., confirmed in 1811, was not intended to include the body of water more than a mile in width that is between the mainland and St.

Vincent's Island, any more than the grant to Panton, Leslie & Co., confirmed in 1806 was intended to include Appalachee Bay or St. George's Sound or Apalachicola Bay, or Ellen Butler Bay, or North Bay, which lie between the lands on the mainland and the islands that were granted to Panton, Leslie & Co.; or any more than the grant to John Forbes & Co., in 1811, was intended to include the Fortress at St. Marks. See-Mitchel v. United States, 15 Pet. (U. S.) 52, text 87.

Affirmed.

WEST AND TERRELL, J. J., concur.

TAYLOR, C. J., AND ELLIS, J., concur in the opinion.

BROWNE, J., dissents.

BROWNE, J.—Dissenting.

This case seems to hinge upon, and may be determined by one question, what did the Indian tribes intend to convey to Panton-Leslie & Co., and to John Forbes & Company? For it seems clear to me, that the Spanish Government ratified without equivocation or mental reservation, whatever the Indians intended to grant.

The Supreme Court of the United States has upheld the ratification of these Indian grants in a suit in which part of the upland only was involved. Mitchell v. United States, 9 Pet. 711.

There it was held that the Spanish Government having confirmed the grants before the United States Government acquired Florida from Spain, the United States had no right or title to the upland in disputes.

The opinion of the majority in the instant case is pre-
dicated upon the doctrine that those claiming ownership
below high water mark under a grant from the government
must clearly show that such was the intention of the gov-
ernment making the grant.

If the titles of Panton-Leslie & Company and John
Forbes & Company, which were confirmed by the Spanish
Government, rested upon a conveyance from a private in-
dividual, the doctrine invoked in this case might be appli-
cable, as it could be contended that in the absence of any-
thing to the contrary, the Indian tribes may have held.
title to the submerged lands only for the benefit of the
public, in the same manner that other sovereignties hold
such lands.    But it seems to me that ''the government
making the grant''—the Tallapoosa and Seminole Indians
in the matter of the Panton-Leslie Company and the Lower
Creek and Seminole Indians in the grant to John Forbes
& Company,—intended to grant the area embraced within
the description, without distinction between upland and
submerged lands.

The opinion in this case says, ''where private ownership
is asserted in property that under the law is a subject of
common or public use, the claimant must clearly show that
the private exclusive right that is asserted was lawfully
acquired through competent authority in the premises.''

All real property held by the Indians under their law
was ''a subject of common or public use,'' and it follows
that any grant by them of the upland would have to be
established by as clear and positive proof as a grant of the
submerged lands or lands below high water mark.

In considering this question, we need not be confused
by distinctions that exist in governments where there is
private ownership in uplands, and government ownership
or control in the submerged lands.

Under the laws of the Indian tribes there was no private ownership of either the upland or the submerged lands; but the tribes held the title to all such lands in the same manner that other sovereignities hold title to submerged lands. The members of the Indian tribes obtained their livelihood largely from hunting and fishing, and the tribal government held the upland and the submerged lands for the benefit of all the members of their tribes for these purposes.

No distinction between upland and submerged lands, or the method of their tenure was known to the Indian tribes. A territory within certain prescribed boundaries over which the Indians exercised dominion was transferred by them to Panton-Leslie & Co., and John Forbes & Co. The Indians did not have in contemplation the mere granting of the uplands, as under their law and customs there was no distinction between them.

This was well known to the Spanish Government when it ratified the Indian grants. *Without* this ratification, the title to the uplands would not have passed to Panton-Leslie & Co., and John Forbes & Co., and *with* it, went everything that the Indians intended to grant.

We are considering a case where both upland and submerged lands were held by the same tenure. In the case of Mitchell v. United States, *supra,* the court in its statement of facts said, "it is not deemed necessary to recite more specially the various original deeds from the Indians, or those made in councils *after the lines had been* marked which designated the boundaries of the respective grants." * * * * "Those of the Indians recite the considerations which led to the grants, *convey the lands with a warranty of their title by ascertanied boundaries.*" Italics are mine. These "ascertained boundaries" included both upland and submerged lands, and the Supreme Court of

the United States held in the Mitchell case that the Indians conveyed the lands within the prescribed boundaries. The court says with reference to the acts of confirmation by the Spanish Government, "those of the governor ratify and confirm the grants in full and direct dominion, and in full property, put the grantees in possession, and promise to defend and maintain it."

In ratifying the grants made by the Indians, which, says the Supreme Court, were "marked with designated boundaries," the Spanish government did not specify that it ratified the grant only as to *the uplands;* nor is there anything in their ratification that excluded the submerged lands.

The Supreme Court further said, "the original deeds, and the demarcation of lines and boundaries were made, in the presence of the commandant at St. Marks, exercising the offices of Lieutenant Governor and sub-delegate of the intendency, or were approved by him; every act done in relation to the cessions and their ratification, from the first application to the Governor General in 1799, to their consummation in 1811, was public and notorious to both Indians and whites."

So complete was the cession by the Indians of their title to and dominion over all the territory within the "ascertained boundaries," that they would not go, for the purpose of hunting, upon any of the territory included within those boundaries, without the permission of their grantees.

Hunting by the Indians necessitated to a great extent the use of both the land and the water, for within the ceded territory there were rivers, lagoons, bayous and bays which it was necessary to cross or traverse in their hunting expeditions. After their grant to Panton-Leslie & Company and to John Forbes & Company, they abstained from the right of hunting on the ceded territory without

asking "permission from the house to hunt upon them, and with the exception of some occasional depredations, respected their possessions and property." Mitchell v. United States.

Continuing, the court said: "That by the law of nations, the inhabitants, citizens, or subjects of a conquered or ceded country, territory or province, retain all the rights of property which have not been taken from them by the orders of the conqueror, or the laws of the sovereign who acquires it by cession, and remain under their former laws until they shall be changed."

Within the territory claimed by the Indians in Florida "the inhabitants, citizens or subjects" had no private rights of property. All right of property both to the upland and the submerged lands was in the Indian tribes.

If, *ipso facto*, by conquest, Spain acquired dominion over the submerged lands which the Indian tribes held for common or public use, it acquired also dominion over the upland, as that was held by them by the same tenure that they held the submerged lands.

When the Spanish Government confirmed the grant of the Indians—unless there is something to be found within the terms of the ratification or in the circumstances attend-. ing it, that the Spanish Government intended to distinguish between the upland and the submerged lands,—the conclusion seems irresistible that the Spanish Government ratified the transfer of the title to and dominion over everything, whether upland or submerged lands, within the "ascertained boundaries."  •

To the Indians and in the Indian law there was no more distinction between upland and submerged lands, than there was between the top-soil and the sub-soil.

They granted to Panton, Leslie & Co. and to John Forbes & Co. all that they claimed ownership to or dominion over,

within the ascertained boundaries, and this broad grant was confirmed and ratified by the Spanish Government without reservation.

The contention that simultaneously with the acquisition of Florida by the Spaniards, the Indian tribes were divested of all dominion over and right to the submerged lands which the Indian tribes held, together with the uplands, for the use and enjoyment of all their subjects, and consequently Spain's ratification of the grant of the Indians included only the uplands, rests upon one of two hypotheses; neither of which seems tenable to me.

First, that the Spanish Government did not know that the Indian tribes held the title to the upland and the submerged lands by the same tenure and thought that the Indians were only selling the uplands contained within the "ascertained boundaries."

Spain at that time was one of the most highly civilized and cultured nations of the world, and its familiarity with laws and customs of all nations with which it traded, civilized or uncivilized, was second to none. We must, therefore, reject that hypothesis.

The second is, that the Spanish Government,—knowing that the Indians claimed property in, and dominion over, both the upland and the submerged lands, and when they granted lands within "ascertained boundaries," made no distinction between them—ratified the grant of the Indians with a mental reservation that they were not granting, and that Panton, Leslie & Co., and John Forbes & Co. were not receiving, what all parties to the transaction supposed they were; that is, the upland or submerged lands within the prescribed boundaries. I cannot accept that hypothesis, as there is nothing in the action of the Spanish Government in the matter of their ratification to indicate that they practiced or intended to practice such duplicity.

When the United States acquired Florida from Spain, it claimed ownership of the lands that had been granted by the Indians to Panton, Leslie & Co. and John Forbes & Co., and sought to destroy the effect of those grants and their ratification by the Spanish Government.

The Supreme Court of the United States, however, rejected the claim of the United States Government and sustained the Indian grants and the Spanish ratification, as to the upland, as that was the only part of the tract in controversy.

The State of Florida is now making the same contention with regard to the submerged lands, but as it seems clear to me that both must be tested by the same principles, the State of Florida has no more claim to the submerged land than the United States Government had to the upland.

I am, therefore, forced to these conclusions: that the Indians intended to grant everything within the subsequently ''ascertained boundaries,'' whether upland or lowland, except the channels of certain navigable waters, to which no claim is made in the bill; that the Spanish Government with full knowledge of this, ratified and confirmed these grants, and with such ratification and confirmation, went everything that the Indians intended to grant.

I think the decree sustaining the demurrer should be reversed.