BOOTH, Judge.
This cause is before us on appeal from the judgment of the circuit court entered following a nonjury trial in a suit to establish the boundary between lands owned by the parties in Gadsden County. We adopt the facts and ruling of the able trial court, as stated in the final judgment, in pertinent part, as follows:
“3. The plaintiff, Taff, claims its title under a warranty deed to it, dated October 5, 1973, from the defendants, Harrell and Lambert, describing by courses and distances property recited as containing ‘924.-88 acres, more or less, and being part of Lot 59, and Lot 60, and a part of Lot 61 of McNeil’s Little River Survey of Forbes Purchase and being in Township 1 North, Range 4 West, Gadsden County, Florida.’ The courses and distances description commences at the ‘Northwest corner of Lot No. 60 of McNeil’s Little River Survey of Forbes Purchase.’ The calls successively run along the courses and distances set forth in a survey known as the ‘Shelter *1377 Survey’ which is in evidence and will be referred to more particularly hereinafter. This deed was recorded October 5, 1973 in the public records of Gadsden County at OR Book 165, Page 325.
4. Defendant, St. Joe, claims its title under a warranty deed to it from Blucher Blair and wife, dated October 2, 1952, recorded October 4, 1952 in Deed Book 100, Page 299 of the Gadsden County public records. It conveys:
‘All of Sections 19 and 20, of Township 1 North, Range 4 West and also all of Section 24, Township 1 North, Range 5 West.’
5. For purposes of this case, it is assumed that the plaintiff has title to lands included in Lots 59 and 60 of McNeil’s Survey and that its south boundary coincides with the north boundary of Sections 19 and 20 of Township 1 North, Range 4 West, which are St. Joe’s lands.
6. The disputed area is some 152 acres lying between two survey lines, one known as the Flanagan line and the other the Shelter line. Plaintiffs contend the Shelter line correctly marks the south boundaries of the McNeil Lots 59 and 60, which coincide with the north boundaries of Sections 19 and 20, Township 1 North, Range 4 West. The defendants claim the Flanagan survey line is the more credible location of the line between the McNeil Little River Survey Lots 59 and 60 and the fractional Sections 20 and 29 of Township 1 North, Range 4 West.
7. The lands involved here lie within the Forbes Purchase, which are certain grants of Indian interests confirmed by the government of Spain prior to acquisition of the Floridas by the United States from Spain under the treaty of cession. These grants have been recognized by the courts as having vested the title to these lands into private interests and were not part of the public domain acquired by the U.S. Government by the cession. Mitchel et al. v. United States, 9 Pet. 711, 9 L.Ed. 283; Clark v. Cochran, Fla. 1920 [79 Fla. 788], 85 So. 250. See also: Apalachicola Land etc. Co. v. McRae, Fla.1923 [86 Fla. 393], 98 So. 505.
8.There appears to have been made during or prior to May 1824 a survey and map of what is referred to as ‘General Plan of The Little River Survey in Forbes Purchase Gadsden County, Florida.’ A map was prepared by Daniel F. McNeil on which it is recited that the map represents 28,460 acres in the territory of Florida known as the John Forbes & Co. purchase, lying on the west side of the Ochlockonee and Little River. It recites a part was originally laid off by Messrs. Brown and McBride under the direction of John McKinnon, Esq. into square tracts of 800 acres by magnetic meridians and parallels intersecting each other at right angles and was subsequently in pursuance of a writ of partition granted by the Superior Court of West Florida in November term 1823, divided by the ‘undersigned,’ i.e. McNeil and by William Cameron into tracts of 400 acres, together with the irregular tracts on rivers and boundary lines as exhibited in an attached table. The northern boundary is an irregularly run line to which certain numbered lots abut, all of which are necessarily of irregular shape. Also, the eastern boundary lies along the stream flow of Little River to its junction with the Ochlockonee River and thence downstream adjacent to the Ochlockonee until it reaches the southeast corner of Lot 77. Along the river boundaries are also plotted fractional or irregularly shaped lots. A table shown on the map gives the acreages assigned to the various irregularly shaped lots with some containing more than 400 acres and some less. The south boundaries of Lots 59 and 60 are not along natural monuments, but they are shown as a straight east and west line at right angles to the east and west boundaries of the lots. Lots 59 and 60 adjoin each other with a common boundary on the west side of Lot 59. Both lots appear to be rectangles, with a north and south depth greater than that of the east and west width.
*1378 9. Lands outside the Little River Survey seem to have been the subject of some government surveys with assignment of sections and townships in accord with the normal rectangular system and being tied in with other official surveys. However, it appears that such surveys accorded no recognition to the Little River Survey, but purported to project section and township lines into the area without notice of or tying into the Little River Survey lots.
10. It seems clear that a number of surveys have been made in the area, with the placing of monuments and markers, blazing of trees, painting of trees, and other indicia of lines of lot and section boundaries.
11. A long commentary could be written on the various features on the ground, which would be supportive of both the Shelfer and the Flanagan surveys. Suffice it to say that each is supported by significant markers. We do not have field notes on the McNeil Survey, and the map refers only to trees as markers on the southern boundary of Lots 59 and 60. These references are to pine trees shown as standing on the southern line. Presumably these are witness trees in existence in 1824. It is obvious that Sections 19 and 20, Township 1 North, Range 4 West are not whole sections if the McNeil Survey is given any validity. These are in fact fractional sections. It seems to be conceded that the McNeil Survey Lots 59 and 60 do lie north of and adjacent to fractional Sections 19 and 20.
12. The most significant evidence is the deposition testimony of Mr. Blucher Blair, who sold Sections 19 and 20 to St. Joe in 1952. He positively testified that he had caused his north line to be surveyed by Mr. Shelfer, that he had marked the northeast corner of Section 20 with an iron axle or other metal marker, and that he had gone along the north boundary of his lands and had cleared the line and painted trees on the line. He also had inserted an iron pipe along this line, and also set an iron or steel beam at the point on the survey, which now is the southwest corner of lands claimed by Taff. His testimony indicates that this is the line recognized by St. Joe at that time, as it installed there one of its standard St. Joe concrete markers.
13. There is also evidence that Mr. Gragg, a predecessor in the chain of title of Taff s claim, placed his marker at the point Mr. Blair and St. Joe had placed theirs at the Shelfer Survey northeast corner of Section 20. Also, there is evidence of the installation by Mr. Gragg of one strand of barbed wire along the Shelfer line.
14. The evidences to support the line claimed by St. Joe include location of a witness spring mentioned in the field notes of government surveyor Joseph Wright, made in 1825, which is described as being 66 feet south of a mile post which would mark the northwest corner of fractional Section 19. This reference point in only a general way ties in with surveys relied upon by St. Joe. There are some other markers in the form of concrete markers, identified with St. Joe, along the line. East of the property involved here are rather consistent markers of south corners of McNeil Survey Lots 50, 49, 41, 40, 31, and 30. All of these lots are on the same tier of lots as Lots 59 and 60, and their south boundaries are the south boundaries of the McNeil Survey. These corners applied to a straight line moves in a general east-west direction but with a marked bias toward the north, with the effect that as that line is applied westward the size of the McNeil lots is markedly reduced considerably below the described 400 acres assigned to these lots.
15. The Flanagan Survey started at an old concrete monument designated as the southwest corner of McNeil Lot 75. The course eastward proceeds on what is described as an old blazed line to a point 416.4 feet east of the point of the southwest corner of Lot 60. The line then moves almost due north 1043 feet, then moves on an easterly course along what is *1379 described as an ‘Old blazed line’ and continues on that course to an old stake shown to be at the north junction corner of Sections 21 and 22. Thus this survey makes a significant jog in Lot 60, moving over a thousand feet to the north before continuing on a straight easterly course. If the line of the old blazed line west of the jog was extended eastward along the same course, it would virtually coincide with the Shelter Survey line.
16. The jog in the Flanagan line places the southern boundary of most of Lot 60 and all of Lot 59 and the other McNeil lots in the southern tier over a thousand feet further north than the southern boundary of McNeil lots in the same tier, west of Lot 60. The map of the McNeil Survey indicates no such jog anywhere along its southern boundary in those areas.
17. The Shelter Survey is deemed the more credible of the surveys offered in evidence, though, as noted, there are monuments and markers to support the line contended for by St. Joe. However, any uncertainty as to the location of the boundary may be resolved by resort to evidence of the intent of the parties. The Court places itself as nearly as possible in the situation of the parties at the time of the conveyance, and will consider the construction given by the parties as shown by their acts and admissions. Section 17, Adjoining Landowners, 1 Fla.Jur.2d Page 462; Am. Jr.2d, Boundaries, Section 2. See also: McCormick-Hannah, Inc. v. Magender [Magruder], Fla.1935, [121 Fla. 142], 163 So. 407; Hancoy Holding Co. v. Lambright, Fla.1931, 133 So.2d 631 [133 So. 631] and Citizens State Bank v. Jones, Fla.1930, 131 So.2d 369 [100 Fla. 1492, 131 So. 369],
18. The testimony of Mr. Blair, together with other acts of himself and of St. Joe in recognizing the Shelter Survey line as the northern boundary of the lands acquired by St. Joe, abundantly establish that that line was the line the parties recognized as the northern boundary of the lands conveyed to St. Joe by the Blairs. Supportive and consistent with this are the acts of Mr. Gragg and his successors. It appears that it has only been in comparatively recent times that St. Joe or its agents have sought to claim a different line.
19. In view of all these considerations it is adjudged that the effective boundary between the Taff lands and those of St. Joe is that shown on Plaintiffs Exhibit 8, being a plat prepared by Biddy, Chapman and Associates for St. Joe Paper Company, designated a plat of North Line of Sections 19 and 20, Township 1 North, Range 4 West. The plat shows a hatched area marked ‘Encroachment — 151.99 acres more or less.’ Red marks have been made on the exhibit representing the corners of the ‘encroachment,’ which is the disputed area. The boundary adjudged to be controlling is that lying from corner marked in red ‘B’ to corner marked in red ‘C.’ All lands lying within the area marked ‘Encroachment’ are found to be owned by the plaintiff, Taff.
20. Accordingly, the equities are with the plaintiff, A.B. Taff & Sons, Inc., and against the defendant, St. Joe Paper Company. The rights of the parties are hereby declared as hereinbefore described. The plaintiff, Taff, is determined to be the owner of the property described in Paragraph 5(a) of the Complaint filed August 13, 1981, which description is by reference incorporated herein, and that the claims of St. Joe Paper Company in said property are denied.”
We have considered the record and briefs filed by the parties, as well as heard oral argument, in this cause and find that the record amply supports the conclusion of the trial court that the Shelter line is the true line. As to Paragraph 17 of the trial court’s order, quoted supra, we do not agree with appellant’s contention that this paragraph is based on the doctrine of boundary by acquiescence. The trial court in that paragraph refers to his consideration of the intent of the parties, as shown by their acts with reference to the location *1380 of the line. This is a reference to the “doctrine of practical location,” an equitable principle described in Florida Jurisprudence,[1] as follows:
In fixing the location of boundary lines, all words of description used in the instrument of conveyance must be harmonized and given effect if possible. Generally, if there is no ambiguity in the descriptions used, they are to be taken as conclusive evidence of the intention of the parties. Where, however, the location of boundary lines is uncertain by reason of inconsistent or conflicting or otherwise ambiguous descriptive calls in the conveyance, the intention of the parties becomes the primary guide in locating the proper boundaries, particularly where a conflict of interest appears under a different construction. The court places itself as nearly as possible in the situation of the parties at the time of the conveyance, and will consider the construction given by the parties as shown by their acts and admissions, (footnotes omitted)
The trial court, confronted with conflicting surveys and conveyances of the property on the north side of the boundary by a metes and bounds description, while that on the south side of the boundary was conveyed according to the government survey, took extensive testimony and viewed the property, walking the disputed area. His determination that the Flanagan line, with its unexplained 1,000-foot “jog” to the north, was less credible than the Shelter Survey is overwhelmingly supported by the record before us.
Accordingly, the judgment below is affirmed.
ERVIN, C.J., and ZEHMER, J., concur.

. 1 Fla.Jur.2d § 17, Rules of construction; effect of intent of parties, at 463.