BOOTH, Judge.
This cause is before us on appeal from a judgment quieting title in certain lands in Alachua County to appellee Charles Webb. Appellant contends, inter alia, that the trial court erred in finding that the Arredondo Land Grant[1] divested the sovereign of title *1382 to the lands beneath Orange Lake, a navigable water body.
Briefly, the historical background is that from 1763 to 1783, the country then known as Florida, divided into East and West Florida, was under British rule. At the conclusion of the Revolutionary War, Florida reverted to Spain under the Treaty of Paris, executed in 1783. Spain’s dominion over East and West Florida continued from 1783 to 1821, when under the Treaty of Amity, ratified on February 19, 1821, Spain ceded East and West Florida to the United States. Article VIII of the Treaty of Amity provided that “[a]ll the grants of land made before the 24th of January 1818, by his Catholic Majesty, or by his lawful authorities ... shall be ratified and confirmed to the persons in possession of the lands.” 42 Fla.Jur.2d Public Lands § 3 (1983).
The Arredondo Grant, occurring on December 22, 1817, was a cession[2] of land executed on behalf of the King of Spain by Don Alexander Ramirez, the Intendant of Cuba, to Don Fernando de la Maza Arre-dondo. The Arredondo Grant preceded the applicable date of Treaty of Amity by one month, so that grant was ratified and confirmed to all grantees in possession on the date of the treaty. United States v. Arredondo, 6 Pet. 691, 31 U.S. 691, 8 L.Ed. 547 (U.S.1832).
However, as to sovereign lands under navigable waters owned by the King of Spain on the date of the treaty, title was transferred to the United States and held for the benefit of the people. When Florida was admitted to the Union in 1845, the ownership of lands under navigable waters was transferred to the State of Florida. 42 Fla.Jur.2d Public Lands § 4 (1983).
The Law of Spain at the time of the Arredondo Grant was that submerged lands under navigable waters were within the sovereign dominion of the King and could not be converted to private ownership, except by grants or conveyances either made by the King or else expressly authorized by him. 42 Fla.Jur.2d Public Lands § 12 (1983), and cases cited therein.
The Arredondo Grant was not made directly by the King but by another acting on his behalf. In addition, there is no evidence that the King expressly authorized the conveyance on his behalf of lands beneath navigable waters within the Arredon-do Grant.
On substantially similar facts, the Florida Supreme Court in Sullivan v. Richardson, 33 Fla. 1, 14 So. 692, 721-722 (1894), ruled that a land grant by the same Don Ramirez to one Don Pintado, purportedly conveying lands beneath Pensacola Bay, did not convey the submerged land, holding:
That the king of Spain, in the exercise of his great power, might have made a grant of this kind [i.e., lands under navigable waters], is not denied, nor need it be.... [Y]et there is not to be found anywhere anything that justifies the conclusion that it was the purpose of the king to confer upon intendants the power to make a grant like this.... We fail to find a line in any American adjudication that has been formulated with reference to, or can be regarded as an authority in favor of, the exercise of the power asserted here by Ramirez, or a provision of Spanish law, general or special, that supports his exercise of the power.... Conceding that the king had the power to regulate the use of such waters, yet there is nothing which has been brought to our attention that tends to prove that he had confided this power of regulation to the intendant. Had it been the purpose of the king that such important rights as are attempted here to be conferred upon Pin-tado should be at the disposal of the intendant or other subordinate, it seems reasonable, if not certain, that some ordinance or other law regulating the subject would have been made, and be extant with the many others made specially applicable to the prov- *1383 inces_ In the absence of some ordinance changing the general law, that law, as it is set forth above, defined the rights of the public in the shore and such waters, and was binding on the inten-dant, as it was on the citizen, [emphasis added]
Thus, the Sullivan court specifically found that Don Ramirez did not have the power to grant title in the lands under navigable waters. The court held that submerged lands under navigable waters were held by the King for the common use by the public. Alienation of submerged lands under navigable waters to private ownership could only be accomplished by the king, or by specific authorization (i.e., ordinance or regulation) to someone acting for the king.
Following Sullivan, we hold that Don Ramirez did not have the power to grant title to land beneath navigable waters. We further hold that, even assuming Ramirez had the power to grant such land, the grant is deficient because it does not expressly state the intention to divest the public of access to the submerged lands beneath the navigable waters contained therein, as required by Sullivan, 14 So. at 710:
Construing the grant as vesting in the grantee the extensive rights indicated above [i.e., title to submerged lands beneath navigable waters], the result would have been that the population of Pensacola, and of the lands east and west to the bayous, would have been deprived of the right of using for any purpose, or even , entering upon, the water within the described limits of the grant_ Surely, a construction entailing such consequences will never be given to a public grant, in the absence of conclusive proof of an intention that they shall result. Such proof must be manifest by terms expressly stating or necessarily implying the intention. In the absence of such manifestation, the proof must be held not to exist, [emphasis added]
In Apalachicola Land & Development Co. v. McRae, 86 Fla. 393, 98 So. 505 (1923), the court held:
By the laws and usages of Spain the rights of a subject or of other private ownership in lands bounded on navigable waters derived from the crown extended only to high-water mark, unless otherwise specified by an express grant. And though the Spanish possessions in America were held by the crown to be disposed of at will, a grant or concession of lands under navigable waters and tide lands was not in accord with usual customs of the kingdom, such lands and waters being held as res communes for the public use; and a conveyance of them to private ownership could be consummated only by a clear showing of express sovereign intent_ [emphasis added]
In the instant case, Bruce Chappell, archivist at the Library of Florida History, testified that there are no distinctions in the Arredondo Grant between submerged lands and uplands. We have found no reference to submerged lands in the grant.[3] *1385 In the absence of express language granting the submerged lands, such lands are not conveyed. We hold that appellee’s contention that the submerged lands were implicitly granted is without merit.[4]
Accordingly, the final order is reversed and remanded for the trial court to enter an order quieting title to the submerged lands in question to the State of Florida.
BARFIELD and MINER, JJ., concur.

. Appellee’s land is located within Arredondo Land Grant, and a portion of the land included within appellee’s deed lies waterward of the margin of Orange Lake.

. The pertinent definition of "cession," as found in Volume II The Oxford English Dictionary 1057 (2nd ed. 1989), is “[t]he action of ceding, or surrendering to another, rights, property or anything to which one has a title or claim."

. The Arredondo Grant, as translated in United States v. Arredondo, states in pertinent part:
Don Alexander Ramirez, intendant of the army, and subdelegate superintendent-general of the royal domain of the island of Cuba and the two Floridas, president of the tribunal of accounts and of the board of tithes, superintendent of the department of the crusades, judge particular of vessels putting in port by stress of weather, and protector of the royal lottery, superior chief and inspector of the royal factory of segars, etc.
Whereas Don Fernando de la Maza Arre-dondo & Son, merchants of this city, have presented a memorial to this intendency general and subdelegate, of the 12th of November last, in which they pretend to obtain, as a gratuitous grant, a lot of land in East Florida, where they have been established, and where still remains the greater part of their family, and a great deal of their property, offering to form an establishment in the territory known under the name of Alachua, as it is adapted to the growing of cattle and the culture of provisions; said establishment to be composed of two hundred families, which they are to convey at their own costs, proposing other advantages which will result, not only in favor of the other inhabitants already established, and residents of the city of St. Augustine, but also in favor of the Creek and Seminole Indians, living on the borders of that country, provided they obtain in absolute property the said *1384 grant limited to four leagues of land to every point of the compass, fixing as the central point thereof the indicated tract of Alachua. And the said memorial having passed by my decree of the 12th instant, to the captain of infantry, Don Vincente Sebastian Pintado, surveyor-general of the two Floridas, for his information, which he gave on the 15th of the same month, with all the necessary information and solid reasons which demonstrate and make known the convenience and utility of providing for the increase of population in said province without expense to the royal treasury, and of accepting the offers of the interested parties, on account of the importance of the undertaking, and of the considerable disbursements which they will have to make to carry the same into effect. In consequence thereof, by a decree of the same day, the subject was communicated to the auditor fiscal of the royal domain, who, in his representations of the 17th, founded on the sovereign disposition concerning the increase of population in those possessions of his majesty, supported the pretensions of Maza Arre-dondo & Son, gave his consent in order that the land which they solicit be granted to them in the terms they propose. Wherefore, on the day of yesterday, I provided the act which follows: Seen. In virtue of the royal order of the 3d of September, in this year, by which, in appointing me superintendent of the two Flor-idas, his majesty commands me, in express terms, to provide for the increase of population in those provinces by every means which my prudence and zeal may dictate, with the concurrence of his lordship the fiscal, and with the report of the surveyor-general of the said province, the tract called Alachua, in East Florida, is declared to belong to the royal domain. In consequence whereof, and in attention of the notorious integrity and fidelity, to the known capital and other good qualities of Don Fernando de la Maza Arredondo & Son, I grant to them the part which they solicit of the said tract belonging to the royal domain, in conformity to the sovereign dispositions on this matter, and with the precise condition to which they obligate themselves to establish thereon two hundred families, which ought to be Spanish, with all the requisites which are provided for, and others which will be provided by this superintendency, in virtue of the said royal order; the said establishment to begin to be carried into effect in the term of three years at farthest, without which this grant will be null and void; said grant is also understood to be made without prejudice to a third party, and especially to the Indians, natives of that land, who may have returned, or may pretend to return, to make there their plantations. Let this expedient pass to the surveyor general above mentioned, in order that he may make the corresponding plot, in conformity to his information, and the granted extent of four leagues to every wind in a rectilineal figure, with all possible perspicuity, to avoid future doubts and litigations; which, being done, let the title in form be executed, with the same plot annexed thereto, a copy of which will remain in the expedient, with the provision that the said three years allowed to commence the establishment of families are to run and be counted from this date; and that, on the first families being prepared and disposed, the grantees will give notice of it, together with a list of the individuals, and mention made of the places of which they are natives, of their occupation, in order that the orders and instructions which the government and the superintendency of the royal domain in East Florida may see fit to give, be issued, and in order that an account of the whole be given in proper time to his majesty.
The figurative plan, formed by the surveyor-general aforesaid being presented, with the explanation which, in continuation he gave of the survey and demarcation, it results that the tract of land is situated in East Florida, fifty-two miles, more or less, distant west from the city of St. Augustine, and about thirty-six miles west of the western margin of the river St. Johns; bounded on every side by vacant lands, the place known by the name of Ala-chua being towards the centre, which place was formerly inhabited by a tribe of the Seminole Nation, which abandoned it; and according to the dimensions and form, which were given to the tract in said plot, and the report annexed to it, it is specified that, as the leagues used in that province are equal to three English miles, containing each one thousand seven hundred and sixty yards or eighty chains of Gunter, the space granted contains two hundred and eighty-nine thousand six hundred and forty-five English acres, and five-sevenths of an acre, equal to three hundred and forty-two thousand two hundred and fifty arpents, and one-seventh of an ar-pent (a measure used in West Florida), and counting for an English acre one hundred and sixty perches and sixteen and a half feet, London measure, to a lineal perch as used in the time of the British dominion, and tolerated since by our government. Wherefore, in the exercise of the faculties which have been conferred upon me by the king our lord, whom may God preserve, and in his royal name, I do grant, gratuitously, to the said Don Fernando de la Maza Arredondo & Son, the number of acres of land as above stated, under the limits, courses, and distances, pointed out in the figurative plot, a copy of which will be annexed to this title, in order that they may possess the same as their own property, and enjoy it as the exclusive owners thereof, and in the terms exposed in my decree inserted in it. In testimony whereof, I have ordered the execution of this title, signed before me, and sealed with the royal seal used in my office, and countersigned by the commissary of war, Don Pedro Carambot, his majesty’s secretary *1385 of this intendency and of the subdelegate superintendency-general. Given in the Havana, on the 22d of December, 1817.
[L.S.] Alexandro Ramirez.

. Essentially, appellee contends that because the grant conveyed a total acreage, which said acreage included submerged lands, it must be inferred that the grant intended to convey rights to submerged lands.